**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TYLON HUDSON; LATON STUBBLEFIELD; ANGELO MATTHEWS; JERMAINE BROOKS; ANTON CARTER, on behalf themselves and all similarly situated individuals,     ) ) ) ) ) ) | |
|     Plaintiffs,     ) ) ) | Case No. 13cv8752 <br> Judge Shadur <br> Magistrate Judge Kim |
|     v.     ) ) | |
| TONI PRECKWINKLE, in her official capacity as President of the Cook County Board of Commissioners; THOMAS J. DART, in his Official capacity as Cook County Sheriff; CARA SMITH in her official capacity as Executive Director of the Cook County Department of Corrections; SUPERINTENDENT OF DIVISION X E.GREER, in his official capacity; SUPERINTENDENT OF DIVISON IX, V. THOMAS, in his official capacity; THE COUNTY OF COOK; OFFICER CAMPBELL in his individual capacity; SARGEANT LEWIS in her individual capacity; OFFICER WILSON in her individual capacity; LIEUTENANT JOHNSON, in her individual capacity,     ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
|     Defendants. | |

<u>**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**</u>

**INTRODUCTION**

1.     This is a civil rights class action complaint brought, under 42 U.S.C. § 1983,

on behalf of the approximately 2000 men who are detained in Divisions IX and X of the Cook

County Jail ("CCJ"). A culture of brutality and lawlessness infects the jail and forces these

men, all of whom are awaiting trial, to live under a constant risk of life threatening violence.

Officers slam people to the floor, stomp, kick and punch them—often while the individuals are handcuffed and shackled. After beating shackled men until they lose consciousness, officers will drag them by their chains, banging their heads on steel doors or allowing their heads to slam into the concrete floor. Officers often violently attack people living with mental illness—generally for behaviors that are manifestations of mental illness or in response to an individual's request for a mental health evaluation. People who appear to be in active psychosis are frequently brutalized by mobs of officers for alleged "non-compliance." Officers also order the men to attack, beat and stomp each other—instigating violence between the very individuals that they are supposed to protect.

2.      The Cook County Jail is the largest single site jail in the United States and one of the largest jails in the world. It is also one of the most over-crowded. Approximately 62,573 people are detained in the CCJ each year.  This means 1.2% of the population of Cook County—and a far greater fraction of the County's young African American men— passes through the jail annually.

3.      CCJ's culture of lawlessness has flourished in large part because of the Defendants' failure to adequately manage the population of the jail and redress the well-documented overcrowding crisis. As a result of the over-crowding, staff resources are not deployed in a way that will ensure the reasonable safety of the people housed in the jail. There is no effective, training, oversight or accountability of CCJ staff. A lack of professionalism and a violent, sadistic, cruel and sometimes racist and homophobic bravado pervades the ranks of the officers, lieutenants and sergeants working in the jail. Living areas are often understaffed or not staffed at all. Officers rarely make rounds or intervene to ensure that people confined in the jail are protected from each other. When CCJ Staff do interact

with the men, it is often in a violent, physically aggressive matter. In short, CCJ line staff conduct themselves as if they are at war with the men they are required to supervise and protect because the jail is overcrowded and understaffed and lacks adequately trained and supervised officers.

4.      The Defendants have long been on notice that the men in their custody endure tortuous conditions, in large part because for many decades, the CCJ has been a lightning rod for litigation. In 1974, people confined in the jail filed a class action, *Duran v. Elrod,* 74 C 2949 ("*Duran*"), alleging abusive conditions in the jail. In 1980, the *Duran* litigation resulted in a consent decree that addressed almost every aspect of jail operations, including the rights of people housed in the jail to protection from harm and excessive force. *Duran* remained in effect for 30 years.

5.      In a 2008 investigation, which occurred while the *Duran* decree was still in effect, the United States Department of Justice ("DOJ") investigated conditions at CCJ and concluded that people housed at the jail were "regularly subjected to inappropriate and excessive uses of physical force." DOJ reported:

> CCJ officers too often respond to inmates' verbal insults or failure to follow instructions by physically striking inmates, most often with the active assistance of other officers, even when the inmate presents no threat to anyone's safety or the security of the facility. Moreover, even in cases in which the initial use of force is reasonable, officers sometimes continue to engage in physical force after the [individual] has been brought under control or is effectively restrained. . . A top security administrator frankly acknowledged to us the existence of "a culture of abusing inmates" when he came to CCJ in October 2006.

6.      The DOJ documented how the over-crowded conditions contributed to violence amongst the men housed in the jail: "Lack of adequate security staff, insufficient direct supervision in the majority of the housing units, a dilapidated physical plant, inadequate

policies and procedures, and an overcrowded environment combine to result in an unsecure facility that is dangerous for everyone on the premises."

7.     Based on these findings, the DOJ filed suit in 2010, *United States v. Cook County Illinois et al.*, 10cv2946 (N.D. Ill.), and the parties entered into a consent decree requiring that the Defendants, among other things, provide the people housed in the jail with reasonably safe living conditions and protect them from excessive force and abuse. The case is currently still pending before Judge Virginia Kendall, and, pursuant to her order, an independent monitor file reports with the Court twice a year, tracking the Defendants' compliance with the terms of the Decree.

8.     However, little has changed in the jail since the DOJ filed suit. The most recent monitor's report, filed in December 2013 (Doc. No. 211 in *United States v. Cook County*) and available to each of the Defendants, finds that the County is not in compliance with critical Consent Decree provisions related to protection from harm and excessive use of force.

9.     The existence of the *Duran* and *United States v. Cook County* litigation is not the only proof that the Defendants have known about—and have chosen to ignore— the brutal conditions in the jail. Individuals who have endured civil rights abuses in the facility have filed hundreds of lawsuits seeking monetary damages from Cook County. In the past three years alone, Defendants Preckwinkle and the Cook County Board have approved litigation settlements totally over $9 million in damages to people who endured civil rights abuses in the CCJ. Rather than preventing violence before the fact, the Defendants let it occur, and then write it off in monetary settlements once the bones are broken.

10.    The sadistic violence and brutality in Divisions IX and X of the Cook County Jail are not the work of a few rogue officers. Instead, these violations demonstrate systemic

problems that have remained unchecked at the highest levels of Cook County government. The Defendants have had actual knowledge of these unconstitutional conditions for decades. Their ongoing failure to halt these abuses and redress the over-crowding crisis at the jail has communicated to officers and other line staff that they can attack individuals and orchestrate violence within the jail with impunity. The Defendants have fostered and implicitly authorized abusive conditions in the CCJ by refusing to promulgate adequate policies on overcrowding, the use of force, and segregation; neglecting to adequately train and supervise officers; failing to conduct meaningful investigations of excessive force and officer-instigated beatings; declining to hold guilty officers accountable; and by ignoring evidence that officers and other officials are covering up incidents of excessive force.

11.     When people complain about the violence or make any effort to defend themselves from the officers' attacks, they are often placed in segregation as retaliatory punishment. In the segregation units, men are locked in their cells for 23 to 24 hours a day. During the one hour per day individuals are sometimes allowed out of their cells, they are frequently handcuffed, shackled and unable to move freely. The segregation cells themselves are unfit for human habitation. The cells are filthy, often streaked with feces and reeking of urine. Meals are delivered through a slot in the door (known as a "chuckhole") and people are forced to eat just a few feet away from their toilet—which is almost never cleaned. Often two men are housed together in these deplorable conditions. "Double celling" people in isolation cells for days, weeks, and sometimes months at a time causes distress and violence in these units—the predictable result of locking together individuals, many of whom live with mental health illnesses, in small, filthy cells for 23 hours or more a day. People with mental illnesses de-compensate quickly in these conditions and, as a result, frequently throw their own feces

and scream loudly at all hours of the day and night. Individuals who enter the segregation units without mental health problems quickly develop anxiety, depression and other mental health illnesses while living in this barbaric environment. The conditions in these segregation units clearly violate any standard of decency and amount to the wanton infliction of gratuitous and unnecessary pain.

12.     Some people are placed in segregation for weeks and months at a time for alleged minor disciplinary offenses, such as attempting to flush a toilet that appeared clogged, refusing to take prescribed medication, playing cards, swearing, and showering in front of female officers. This punishment is imposed without due process, lacks any legitimate penological justification, and is grossly disproportionate to the underlying offenses.

13.     As a result of their actions and inactions, the Defendants have violated the Plaintiffs' rights pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution. The putative class seeks an injunction that will—once and for all—end the longstanding, systemic and well-documented abuses at the CCJ and establish a system of effective, sustainable accountability, which will prevent the constitutional violations detailed in this complaint.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of the Plaintiffs' rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution.

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

**PARTIES**

16.     Plaintiff Tylon Hudson is housed in Division X of the Cook County Jail. He has endured violence and ongoing threats of violence as a result of the Defendants' actions and inactions.

17.     Plaintiff Laton Stubblefield is housed in Division IX of the Cook County Jail. He has endured violence and ongoing threats of violence as a result of the Defendants' actions and inactions.

18.     Plaintiff Angelo Matthews is housed Division X of the Cook County Jail. He has endured violence and ongoing threats of violence as a result of the Defendants' actions and inactions.

19.     Plaintiff Anton Carter is housed in Division IX of the Cook County Jail. He lives in the segregation unit, in which he was placed arbitrarily and without adequate due process, and where he endures deplorable and inhumane living conditions that violate standards of decency. Plaintiff Carter also lives under a threat of violence because of the Defendants' actions and inaction.

20.     Plaintiff Jermaine Brooks is in the custody of Cook County.  He has been housed in the segregation unit of Division IX.  He is currently housed in another local jail, with which CCJ contracts for overflow space temporarily to house individuals who remain in the custody of Cook County and who will eventually return to the CCJ. When returned to CCJ on March 27, 2014, Plaintiff Brooks will be placed in the segregation unit of Division IX.

There, he will endure deplorable and inhumane living conditions that violate evolving standards of decency.

21.     Defendant Toni Preckwinkle is the President of the Cook County Board of Commissioners, which is responsible for CCJ's physical plant and has sole responsibility for funding all CCJ operations and programs. This includes ensuring appropriate resources. Defendant Preckwinkle is sued in her official capacity.

22.     Defendant Cook County through the County Board of Commissioners is responsible for CCJ's physical plant and has sole responsibility for funding all operations and programs of the CCJ—this includes ensuring that the CCJ has the sufficient funding and resources necessary to operate the jail lawfully.

23.     Defendant Thomas J. Dart is the Sherriff of Cook County. He is solely responsible for all security and corrections policies and practices at the CCJ. Defendant Dart is responsible for the care, custody, and control of each individual housed in the CCJ. Defendant Dart is sued in his official capacity.

24.     Defendant Cara Smith is the Executive Director of the Cook County Department of Corrections. She reports directly to Defendant Dart and is responsible for overseeing the implementation of all policies and procedures promulgated by Defendant Dart regarding the operations of the Cook County Jail.  Defendant Smith is sued in her official capacity.

25.     Defendant Thomas is the Superintendent of Division IX. He reports to Defendant Smith and is responsible for the operations of his Division. Among other responsibilities, Defendant Thomas is responsible for tracking and addressing incidents of

violence, uses of force and the use of segregation in his Division. He is sued in his official capacity.

26.     Defendant Greer is the Superintendent of Division X. He reports to Defendant Smith and is responsible for the operations of his Division. Among other responsibilities, Defendant Greer is responsible for tracking and addressing incidents of violence, uses of force, and the use of segregation in his Division. He is sued in his official capacity.

27.     Officer Campbell is a correctional officer who works in Division X. He ordered gang members housed in the jail to attack Plaintiff Tylon Hudson. He is sued in his individual capacity.

28.     Lieutenant Johnson works in Division X and oversees aspects of correctional and security operations in that Division. He refused to take reasonable measures to protect Hudson from harm despite knowing that the threats Hudson faced were credible and immediate. He is sued in his individual capacity.

29.     Defendant Lewis is a female Sergeant who now may be a Lieutenant. During the times relevant to this complaint, she worked on the protective custody unit in Division III. She ordered Hudson to leave protective custody and return to Division X, ignoring the serious risk of harm he faced there.

30.     Officer Wilson is a female officer, who during the times relevant to this complaint worked as a security officer in the law library in Division X. She refused to take reasonable measures to protect Hudson from harm despite knowing that the threats Hudson faced were credible and immediate. She is sued in her individual capacity.

## CLASS ACTION ALLEGATIONS

31.    The Plaintiffs bring this suit on their own behalf and on behalf of all people who now or in the future will be housed in Divisions IX or X of the Cook County Jail.

32.    The class is so numerous that joinder of all members is impractical. Approximately 2,000 men are housed in Divisions IX and X of the Cook County Jail. The class also includes an unknown and unknowable number of future class members, since people regularly are transferred in and out of these Divisions.

33.    There are questions of law or fact common to the class including, but limited to whether Defendants' systemic failure to implement policies and practices necessary to halt the longstanding and pervasive pattern of savage attacks in Divisions IX and X has exposed members of the putative class to an unacceptable risk of brutal violence.

34.    Because the policies, practices and customs challenged in this Complaint apply with equal force to the named Plaintiffs and the other members of the class, the claims of the named Plaintiffs are typical of the class in general.

35.    The named Plaintiffs and their counsel will fairly and adequately represent the interests of the class. The named Plaintiffs possess strong personal interests in the subject matter of the lawsuit and are represented by experienced counsel with expertise in civil rights litigation. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

36.    The Defendants have acted or refused to act on grounds generally applicable to the class: their policies, procedures, practices, acts, and omissions have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

# ALLEGATIONS OF FACT

I.  **DEFENDANTS HAVE LONG KNOWN ABOUT THE BRUTALLY DANGEROUS CONDITIONS IN THE COOK COUNTY JAIL, YET THE PATTERN AND PRATICE OF VIOLENCE AND OFFICER ABUSE PERSISTS.**

37.     The official capacity Defendants[1] are aware, and have been aware for years, of the longstanding pattern and practice in the Cook County Jail—and particularly in Divisions IX and X—of officer inflicted and officer instigated violence. These conditions have been publicly reported, documented and condemned numerous times over the past half century.

38.     In a 1995 Opinion authored by Judge Gettleman, in a case that addressed conditions at the Cook County Jail, the Court noted that in 1964, a researcher toured the Cook County Jail and declared it to be "miserable, overcrowded, crime-and-disease-breeding." *Wilson v. Cook County Bd. of Commissioners*, 878 F. Supp. 1163, 1165 (1995). According to the Court, the then-Superintendent acknowledged that the beating of inmates by other inmates, smuggling of contraband, and other "vicious practices" were routine in the jail. *Id*. The Court highlighted that, ten years after abusive conditions in the jail were first acknowledged publicly, people housed in the jail filed the class action lawsuit in *Duran*. But as Judge Gettleman noted in *Wilson*: "[a]s demonstrated by the instant case and many others like it, neither *Duran* nor the passage of time has lessened the number or volume of complaints by inmates of the Cook County Jail." The same has been true for decades—and holds true now.

---

[1] Unless explicitly specified otherwise, the use of the term "Defendants" throughout this complaint refers only to those Defendants sued in their official capacities.

39.     Thirty years after *Duran* was filed, the DOJ investigation into conditions at the Cook County Jail concluded that a "culture exists at CCJ in which the excessive and inappropriate use of physical force is too often tolerated." The officer- abuse documented by the DOJ demonstrates a pattern and practice of abuse that persists to this day.

40.     The DOJ further concluded that "the severity and frequency of inmate on inmate assaults demonstrated that CCJ is not providing for the safety and wellbeing of inmates. . . .  Many of these incidents occurred in the CCJ's maximum security divisions (Divisions IX and X) where [people] should be supervised at the highest level . . . . The level of inmate on inmate and inmate on staff violence is so unacceptably high, that it is clear inmates are not adequately supervised."  The DOJ findings led them to file suit in 2010, in what became *United States v. Cook County.*

41.     Subsequently, Cook County and the DOJ entered into a Consent Decree containing over 70 provisions related to protection from harm and officer abuse. That same year, the *Duran* Decree was terminated by an agreement of the parties. In the years since, the court-appointed monitor has reviewed the jail's compliance with the DOJ Decree. The most recent monitor's findings from December 2013 suggest that while, in the opinion of the monitor, CCJ may have made progress redressing violence and abusive conditions in the jail, the Defendants are out of compliance with essential components of the DOJ Decree.

42.     Additionally, the monitor reports that the Defendants have failed to: 1) identify a single accurate source of data for uses of force and allegation of excessive use of force; 2) implement a detainee classification system; 3) ensure a collaboration between security and mental health to protect the safety of detainees who live with a mental illness; or 4) implement an adequate staffing plan.

43.     Perhaps most importantly, the monitor emphasizes that the jail over-crowding crisis continues to threaten the safety of people housed in the jail and CCJ staff. The monitor admonishes the Defendants that their collective efforts to address over-crowding lack "focus and sustainability" and notes that, on the over-crowding issue, the Defendants have made "no progress at all."

44.     The monitor further reports that the Defendants have failed to achieve substantial compliance with critically important provisions of the Decree related to officer abuse and violence. Specifically, the Defendants have failed to maintain the staffing and supervision levels necessary for the safe operation of the facility "consistent with generally accepted correctional standards, failed to establish a classification system that "separates inmates in housing units by classification levels in order to protect inmates from an unreasonable risk of harm," and failed to establish a grievance system that is accessible to detainees and confidential informants.

45.     During the past three years, Cook County officials have agreed to pay over $9 million to settle over 250 individual civil rights lawsuits filed by people who endured unconstitutional conditions at CCJ. This litigation has functioned to provided additional notice to the Defendants about the brutal violence and un constitutional conditions at the CCJ  The Defendants were required to approve each of these payouts which include the following:

   a.   $60,000 to a person  who was stabbed after an officer ignored his requests for protection from another person housed at the jail;

   b.   $7,000 to a person with serious mental health issues who was misclassified, placed in Division IX and then stabbed by other individuals housed in that Division;

c. $15,000 to a man who was stabbed and beaten by other individuals housed in the jail;

d. $750,000 to a man who was raped by his cellmate;

e. $1,950 to a person who was attacked by an officer. The officer slammed the man into a wall and beat him while he was restrained in handcuffs;

f. $7,500 to a person who, as a result of his untreated mental illness, was beaten by other individuals housed in the jail ;

g. $5,000 to a man who was beaten and slammed to the ground by an officer;

h. $4,500 to a man who was taken to a dark room and beaten unconscious by an officer;

i. $175,000 to a man who was beaten by another individual housed in the jail in the presence of and at the instruction of officers;

j. $11,000 paid to a man who was raped by another person housed at the jail. Officers encouraged this rape to occur.;

k. $15,000 paid to a man who officers beat and taunted with slurs related to his sexual orientation;

l. $10,000 to man who was assaulted by numerous officers;

m. $5,000 to a person who was pepper sprayed by an officer after he attempted to obtain his prescription medication;

n. $15,000 to a man who was beaten and stomped on in his cell by an officer after he requested to speak to a "white shirt"(referring to an individual higher in the chain of command, usually a Sergeant or Lieutenant) in order to complain about his medically required special diet;

o. $10,000 to a victim of gang-related stabbing that involved an officer-led cover-up;

p. $10,000 to a victim of an officer who handcuffed him, sprayed him with pepper spray and then beat him;

q. $5,850 to a person who was beaten by multiple officers;

r. $25,000 to man who was beaten by two officers and suffered injuries to his mouth and eye;

s. $14,500 to victim who suffered a broken wrist as a result of a beating by an officer;

t. $5,000 to a victim who suffered a broken nose and permanent damage to his eye when he was stabbed by another person housed at the jail;

u. $15,000 to victim who was struck and beaten to the ground by a group of officers;

v. $15,000 to a victim who was beaten by an officer while handcuffed;

w. $100,000 to victim who was punched in the mouth by an officer who was a trained boxer;

x. $15,000 to man who was beaten by officer who told him that "if he didn't like [the beating], he should bond out";

y. $7,500 to a victim who was beaten by a mob comprised of both officers and people housed in the jail;

z. $30,000 to a victim who was beaten by an officer and then left unsupervised with other individuals housed in the jail who subsequently stabbed him;

aa. $2,600 to a man who warned officers that he was at risk of imminent harm but was subsequently stabbed by other individuals in the jail after the officers ignored him;

bb. $2,000 to a victim who was beaten by an officer in an elevator;

cc. $5,000 to a victim who was attacked by officers and, as result, temporarily lost his vision;

dd. $2,500 to a man who was beaten by an officer after he complained about his broken toilet;

ee. $30,000 to a victim who was beaten by an officer;

ff. $8,000 to man who was injured in a gang-related fight. He reported his fears of injury to the superintendent, who responded that he should "be a man and stop running to me. If you want protection, go make a shank";

gg. $2,500 to a victim who was beaten by other people housed in the jail after an officer announced to the other individuals housed at the jail that the victim was a sex offender and then released them to attack the victim.

46.     It is likely that—but for the unique, conflict creating role of Cook County State's Attorney's office—many more individuals who have had their civil rights violated at the jail would be successful in their efforts to seek relief from the Courts. The Sheriffs' office is represented by the State's Attorney civil rights cases concerning jail conditions. The same State's Attorney office also prosecutes the civil rights Plaintiffs in their criminal cases and makes decisions about charges and pleas. The States Attorney's office uses this leverage to their advantage in negotiating with Plaintiffs, encouraging them to drop their civil rights claims in exchange for leniency in their criminal cases. This conflict prevents the just resolution of many valid civil rights claims resulting from abusive jail conditions.

47.     In addition to the *United States v. Cook County* litigation and individual damages lawsuits filed on behalf of people housed in CCJ, the Jail's own internal discipline reports reveal a violent, corrupt culture, and illustrate the Defendants' ongoing refusal to

protect people from violence in their living units. During approximately a two month period, during the Spring of 2013, there were over 403 serious allegations of disciplinary violations in Divisions IX and X. 152 were incidents of violence. 112 document the existence of drugs, weapons or other dangerous contraband on the living units. (Counsel submitted a Freedom of Information Act Request for a longer time period, but the County insisted that the request be narrowed.)

II. **THERE IS A LONGSTANDING, SYSTEMIC CULTURE OF LAWLESSNESS IN THE COOK COUNTY JAIL, WHICH RESULTS IN AN INTRACTABLE PATTERN AND PRACTICE OF OFFICER BRUTALITY AND ABUSE.**

48. DOJ's investigation and findings in 2008 highlighted cases of individual abuse that were representative of the larger inherent problems in the jail's operations. Many of the cases described by the DOJ then are practically identical to the abuse endured by members of the current putative class. These individual cases include:

  a. Alberto P. was beaten by officers after he and the officer argued. CCJ records confirmed he was injured by the officer and required medical care.

  b. Officers attacked Dennis L. after he returned to his cellblock following a mental health evaluation and requested his dinner tray. Dennis received emergency medical treatment for blunt trauma to his head and body, three loose teeth and a laceration to his lip.

  c. After an argument with an officer, Billy D. was beaten by that officer and others. Billy required medical care for a laceration on his lip.

  d. Officers beat Danny P. while he was handcuffed after he argued with an officer. A sergeant eventually found Danny handcuffed and bleeding in his cell. Danny filed a lawsuit against county officials and eventually settled his case.

e. Matthew S. received stiches to his face and a tetanus shot after officers shoved his head into the concrete while he was handcuffed. Officers attacked Matthew after he stood up out of turn at the jail's barber shop.

f. Officers punched and kicked Terrence M. when they discovered he had an unauthorized shirt in his possession. Terrence required surgery for a broken jaw as a result of the beating.

g. After John S. refused to stop tapping on the wall during a strip search, officers beat him, dragged him by his hair and choked him.

h. Jacob requested to speak to a "white shirt" about his housing placement. In response, officers extracted him from his cell, handcuffed him and took him to segregation. On the way to segregation, officers pushed Jacob's head into the wall, threw him down the stairs, and kicked and punched him repeatedly.

i. Robert T. lives with a mental illness. After he exposed himself to a female officer, male officers handcuffed him and then beat him while he was restrained. Robert was hospitalized with severe head trauma.

j. Officers beat Russell G. after he left his cell without permission. Officers handcuffed Russell, stomped on his back and hit him. They then told Russell that he would be charged with battery unless he told medical staff that he injured himself by falling off his bunk.

k. Officers mistakenly believed that Martin S. had stabbed an officer. Officers punched and stomped Martin, hit him in the head with a radio and punched him in the groin.

l.  As retaliation for an assault on an officer, officers entered a cellblock and began indiscriminately beating people housed in that unit, including Andrew B. who had nothing to do with the assault but was nonetheless stomped and kicked by officers.

m.  Jerry M. was attacked by an officer who, during the beating, used his handcuffs like brass knuckles. The officer was recommended for termination as a result of this incident, but was eventually re-instated by the Sherriff's Merit Board.

49.     The excessive use of force and violent and abusive conditions in the jail are well known by County officials and by those who work at the jail. Such officer abuses do not happen in the shadows. Often a large number of officers congregate to assault people housed in the jail and to cheer each other on when these assaults occur. The culture of violence is so embedded in the institution that officers and those housed in the jail have developed their own language to describe the Defendants' abusive practices. Officers will threaten people with a "walk" to an "elevator ride"— this refers to officers' practice of forcing people into the jail's elevators and assaulting them there, out of sight from witnesses and the few cameras that do exist in the living areas.

50.     When officers do attempt to document the use of force with a video camera, the officer operating the camera will yell "camera coming, camera coming," warning their co-workers that their brutality is about to be exposed on film. While beating people housed in the jail, officers will frequently scream "stop resisting, stop resisting" to a person who is not in fact resisting. This is done for the benefit of the cameras and any witnesses in an effort to fabricate a reason to blame the victim for the attack. Officers also have a pattern and practice of attempting to conceal their physical abuse by falsely charging their victims with aggravated

battery. This practice is yet another effort to blame the individuals housed at the jail for the violence perpetrated by the Defendants.

51.     These brutal officer attacks happen with impunity in part because State's Attorney rarely files criminal charges filed against officers who brutalize people housed in the jail. This may be attributable to the dual—and seemingly irreconcilable—role the State's Attorneys office plays as both defense counsel for the Sherriff's office in matters related to jail conditions and as prosecutor of those who commit crimes. If the State's Attorney office prosecuted all the crimes committed by officers it would most certainly expose its client (the Sherriff and his employees) to even greater civil liability.

52.     Degrading, cruel, and sadistic officer attacks are not isolated incidents at CCJ; they are commonplace. This is unsurprising given that the Defendants have promulgated a woefully deficient written use of force policy in May 2011 that promotes the use of unnecessary violence in violation of the Eighth Amendment. Among other deficiencies, the Defendants' policy (1) is confusing and internally contradictory, (2) omits the basic principle that force should only be used to achieve legitimate correctional objectives, (3) authorizes force in impermissible situations; (4) establishes an inadequate system for internal review and investigation of use of force incidents, (5) fails to prohibit the practice of provoking detainees into assaultive behavior as a pretext for use of force; and (6) fails to prohibit punching and kicking detainees.

53.     Defendants Preckwinkle and the County of Cook, through the County Board of Commissioners allow the sadistic and violent use of force to persist at the jail by failing to provide sufficient resources to ensure adequate training, investigations, oversight and accountability of CCJ staff. These Defendants have been aware that the lack of resources

exposes people housed at the jail to an unacceptable risk of being targeted by officer-inflicted violence, yet for many years they have persisted in failing to ensure that the jail receives appropriate resources.

### III.  REPRESENTATIVE EXAMPLES OF OFFICER BRUTALITY ARE LEGION.

#### A.  Officers savagely beat victims who request medical attention or who attempt to complain about living conditions in the jail.

**JOHN DOE 1**

51.     During July or August 2013, in Division X on deck 1-D,  John Doe, who was clearly suffering from mental illness was beaten unconscious by a number of officers including Officers Keating and Williams. This happened in the day room near cell 20. The officers beat Doe after he repeatedly requested medical attention and the ability to speak to a white shirt. At no time during this interaction was Doe violent or posing a threat to security. After Officers Keating and Williams beat Doe, they summoned additional officers who slammed him on the concrete floor while Officer Keating pounded on his head with a closed fist. During this attack, other people on the living unit pleaded with the officers to stop harming Doe, but the officers ignored their pleas.

**JOHN DOE 2**

53.     In September 2013, in Division X, John Doe 2 was attacked by Officers Soto Toledo after he requested his medication. The officers responded to Doe's requests by cursing at him, grabbing him around his throat, handcuffing him and beating him until became unconscious. Once Doe lay unconscious on the ground, Officer Soto dragged him by

the handcuff—banging his head in the process. Doe's blood covered the floor and eventually a sanitation crew was called to clean up the blood.

████████ ████████

54. On June 6, 2013, ████ ████ was abused by officers after he refused to be transported to another county jail because he needed medical attention. (The Defendants transport some people to other counties in an effort to reduce over-crowding at the CCJ). While officers escorted a handcuffed and shackled ████ to the medical unit, he requested that they walk at a pace that would accommodate his need to shuffle because the shackles limited his ability to walk. The officers responded to this request by throwing him to the ground and injuring his hand and leg. ████ received medical attention for the injuries he sustained during this attack.

████████ ████████

55. During the winter of 2013 in Division X, Officer Keating attacked ████ in relation for a lawsuit ████ filed, which detailing a previous attack he endured at the hands of Officer Keating and others (described in ¶ 77 below). Officer Keating confronted ████ about the lawsuit by hitting him on the face with the antenna on his radio, taunting him and calling him a "little bitch." Officer Keating asked ████ why he "put that bullshit" on him. Sergeant Crump observed Officer Keating hitting and taunting ████ in retaliation for filing a lawsuit, but she did nothing to stop him.

**LATON STUBBLEFIELD**

56.     On or about August 2012 in Division IX, Officer Haskel beat Plaintiff Laton Stubblefield after Stubblefield requested permission to clean his cell.  The officers on duty refused his request and forced Stubblefield into a squalid cell filled with another person's garbage. After enduring several hours in these conditions, Plaintiff Stubblefield renewed his request to clean the cell and placed his arm through the chuckhole of his cell door. In response, Officer Haskel used his radio to beat Plaintiff Stubblefield on his arm.  This assault caused Plaintiff Stubblefield's wrist to swell and bruise.

███████ **DOE**

57.     In late August 2013 on the protective custody tier of Division IX, an individual who is transgendered and known as "██████ was attacked by officers after she requested to lodge a complaint with a white shirt. The officers on the tier responded to her request by beating her, spraying her with mace and dragging her out into the hallway. At no time during this altercation did she pose any threat to the officers or to security.

██████ ████████

58.     In January 2012, in Division IX, ████ ████ was slapped by Officer Coleman after he requested a commissary request slip. ███████ was handcuffed during this assault and posed no threat to security. ███████ filed a grievance about this incident and also filed a complaint with the Office of Professional Responsibility.

59.     In September 2012, in Division IX, █████ █████ was assaulted by Officer Zuniga after he requested to stay out of his cell for the full 60 minutes allotted to him pursuant to CCJ rules. ████████ was in the day room during the one hour a day he was allowed out of his cell (although he was kept in handcuffs and shackles). After Officer Zuniga ordered him back in cell after 40 minutes, ███████ protested and requested his full 60 minutes in the day room. Officer Zuniga responded to ████████ requests by slapping him across his face with an open hand. The Officer then grabbed ████████ chains and dragged him away from the cameras. Next Officer Lee and Officer Zuniga removed him from the deck and continued their attack— kicking him and beating him with handcuffs. ██████ was left with a chipped tooth, bruised face, and bruised lips. After 24 hours, ██████ received medical care for his chipped tooth and received x-rays to determine if his ribs were broken.

**JOHN DOE 3**

62.     During the fall of 2013, Officer Lacey attacked John Doe, a very small African-American man who informed officers that he was feeling suicidal and requested a mental health evaluation. Doe repeated this request a number of times and each time, Officer Lacey refused to respond to Doe. In an effort to draw attention to his mental health needs, Doe refused to lock down in his cell when ordered to do so. Officer Lacey responded to Doe's refusal to lock down by dragging Doe into his cell while simultaneously punching him repeatedly in the face with a closed fist. Once Doe was placed in his cell, he took his sheet and began to fasten a noose to hang himself. Eventually, Sergeant Crump came to the deck and ordered the officers to remove Doe from the tier to take him for a mental health evaluation.

**████████ ████████ & ████████ ████████**

63.     In November of 2013, Officers in Division IX beat ████████ ████████ and ████████ ████████ after they complained about the officers' orders that they enter a freezing cold cell with a broken window on Tier 2F. The cell was so cold that flood water covering the floor of the cell had turned to ice. When ████████ and ████████ explained to the officers that they would not enter the cell because of the conditions inside it, the officers responded with brutal force.

64.     One officer threw ████████ on the ground and pressed his jaw into the concrete with his knees. Another officer pressed his knees into ████████ ribs. Throughout this attack, ████████ had a difficult time breathing. CCJ staff sent ████████ to segregation for 35 days after he was attacked. He filed grievances complaining about the attack and his retaliatory placement in segregation, but never received a response.

65.     The officers, including Officer Tadesco, handcuffed ████████ slammed him on the ground, and kicked him in the head. ████████ has a mental rod in his leg from a previous injury. The officers who attacked him caused the metal rod to come out of place and inflicted excruciating pain. Approximately 20 officers—including some white shirts—witnessed this attack.

**JOHN DOE 4**

66.     During the fall of 2013, 4 in Division X, Officer McHaffey threw an already-injured Doe into his cell with such force that he landed on and injured his shoulder.  Officer McHaffey responded violently after Doe requested a bottom bunk because his foot was broken and he could not climb up to the top bunk.

**JOHN DOE 5**

67.     In October 2013, in Division IX John Doe 5, who was known for filing many

grievances documenting officer wrong-doing was beaten by multiple officers after they

searched his cell and threw away his legal paperwork. When the Doe protested and requested

his paperwork back, the officers handcuffed him, threw him on the ground and began

punching and kicking him.

**CHRIS DOE**

68.     In early December 2013, in Division X, officers including Sergeant Duty and

Lieutenant Johnson, attacked Doe after he persisted in requesting protective custody status

from them Another person living on the deck told Doe that he intended to harm him.  Doe

then sought protective custody from both the officer on duty and the white shirts. After

repeatedly denying his request for protections, Duty pushed him into his cell and then Lt.

Johnson began punching him while screaming obscenities. After this attack, CCJ officials

placed Doe in segregation.

██████ ████████

69.     In January 2014 in Division X, ██████ was beaten after he requested to be

placed on a different deck and he refused to go into his cell until he was moved. The officers

refused to move him and instead called for back-up.  In response, a sergeant, a lieutenant and

additional officers arrived on the deck. The officers began to choke ██████ punch him and

throw him in the cell.

70.     In August 2013, in Division IX, Officers, including Officer Appleberry, beat up ███████████ after he complained about the brutal treatment the officers had given an older man who was housed at the CCJ. The older man was slow to return from recreation, and the officers slammed him against a wall. ███████████ protested, and the officers then turned their aggression towards him, jumping on him and punching him. ███████████ was left with visible bruises after this attack.

**MURPHY DOE**

71.     In July 2013, in Division X, Officer Appleberry punched a man in his mouth and knocked out his teeth after the man requested medication for his seizures. After officers removed Doe from the medical unit, where he was questioning the nurse about the discontinuation of his medication, Appleberry ran up to Doe and attacked him.

72.     On November 5, 2013 in Division IX, Officer Areanas attacked ███████ after he complained to about his food tray. Because of a medical condition, ███████ has been prescribed a special diet, but on that day he received a regular tray. When ███████ requested to speak with a Sergeant about his missing tray, Areneas choked and slapped him.

**JOHN DOE 6**

73.     In November 2013, in Division X, Sergeant Duty and Lieutenant Johnson attacked Doe because he was complaining about a broken toilet in his cell. The toilet would not flush and Doe requested to be moved to a cell with a functioning toilet. He refused to enter

the cell with the broken toilet and asked to speak with a white shirt. When Sergeant Duty and Lieutenant Johnson arrived on the tier, they began to punch and beat him. After beating him for several minutes, they handcuffed him, and dragged him off the tier.

**B.     Officers physically attack people who have violated or who are merely perceived to have violated facility rules—even in instances when the alleged violation is relatively minor.**

███████████ ████████

74.     In September 2013, in Division IX on Tier E-1, ████████████ ██████ was beaten and doused with pepper spray in close range after he and his cellmate had a fistfight. The lieutenant on duty only sprayed █████ with pepper spray after the fight had ended—the use of the spray was not to end violence on the unit, but to punish █████ and to inflict excruciating pain upon him. After █████ was handcuffed and doused with pepper spray, Officer Howell punched him in the nose with a closed fist while escorting him off the deck.

███████ ██████

75.     On October 12, 2011, in Division IX, ██████ █████ was attacked by Officer Julio Castillo. Officer Castillo punched █████ multiple times and hit him over the head with handcuffs until he became unconscious. █████ received medical care for the injuries he sustained during this attack. The Defendants then charged █████ with aggravated battery on a peace officer as part of an effort to cover-up the officers' brutality and to ensure that █████ did not complain about the excessive use of force. Officer Castillo told █████ that he attacked him to get a "nine month vacation."

76.     On October 15, 2011 Officer Couch attacked █████ because the officer believed, or purported to believe, that █████ was the aggressor during the incident that

occurred with Officer Castillo. Officer Couch shackled and handcuffed ████ and punched him repeatedly.

████████ ████████

77.     On January 11, 2013, in Division X, Officers Appleberry and Keating beat ████████ based on a mistaken belief that ████████ had physically fought another officer. As ████████ lay compliant on the ground, Officer Keating jumped on him, ground his knee into his back and wrenched his head and neck into a head lock. At the same time, Officer Appleberry proceeded to handcuff him. Then, both officers began to kick and punch the handcuffed ████████ until Officer Bell intervened and told the Officers that ████████ was not involved in the altercation. When officers realized they had attacked the wrong man, the beating ceased.

████████ ████████

78.     During February or March 2013, in Division X, Officers Vereen and Graffeo attacked ████████ ████████ The altercation started when Officer Vereen told ████████ to put on his CCJ-issued shirt. ████████ had previously obtained permission from Lieutenant Johnson to wear a shirt he obtained from the commissary. He tried to explain this fact to Officer Vereen. Officer Vereen responded with profanity and told ████████ that he would "beat his ass."

79.     Eventually, ████████ went back to his cell and to put on his CCJ-issued shirt. Officer Vereen followed him into the cell with a slapjack and began to beat him on the face and head with the weighted weapon. Officer Graffeo then began to hit and kick ████████ Officer Masterson finally came in and ended the attack. He handcuffed ████████ and escorted him to segregation, where was placed for six days without a hearing.

80.     On January 31, 2013 in Division X, on Tier 2-B, ████ ████████ was brutalized by officers after he was attacked by another person housed in the Cook County Jail. The officer brutality likely happened because they falsely believed that ████████ had been the aggressor. The officers handcuffed him, smashed his face into the concrete, and, in the process, dislocated his shoulder. ████████ is still receiving muscle relaxers and physical therapy for the injuries he sustained during this attack.

**JOHN DOE 7**

81.     During the summer of 2013, officers in Division X, Tier 2-B brutalized Doe, who had been involved in a fight. They threw him on the floor and beat him repeatedly with metal hand cuffs. In an effort to cover himself from the blows, Doe moved his arm and hit an officer. The officers responded with increased violence—kicking and stomping him. About 10 officers surrounded Doe who was on the ground and non-responsive. The officers jostled each other in order to be able to land a kick or punch on the victim. Only after the attack ended, did a white shirt come in to videotape the incident. By that time Doe was laying on the floor covered in blood.

**JOHN DOES 8-10**

82.     During November 2013, officers in Division X on 2-B sprayed three people who were locked in their cells and who were not threatening anyone or posing a risk to security with pepper spray. The officers assaulted these men after they protested their mistakenly prolonged nutri-loaf punishment. (Nutri-loaf is food that allegedly provides all nutritional requirements, but is hard in consistency and deliberately unappetizing. It is given

to people housed in the jail in lieu of a meal tray as a relatively serious punishment). The number of days the men were supposed to be subject to this punishment had expired, yet the officers were still serving them the offensive food. In protest, the men placed their hands outside of their chuckholes. The officers responded by spraying all the men in the face with pepper spray while they were in the cells. This direct application of pepper spray on people who pose no threat to security (and who were safely secured in their cells) was done only to wantonly inflict pain.

████  ██████

83.     In May of 2012 in Division IX, █████ ██████ was beaten by multiple officers, including Officer Barnett. The beating happened after ██████ and another person housed at the CCJ fought. The Officers handcuffed █████ forced him to the ground in one of the stairwells in Division IX and punched and kicked him. During this time ██████ was securely handcuffed and was not resisting the officers' orders.

**ANGELO MATTHEWS**

84.     On or about October 22, 2013, in Division IX, Plaintiff Angelo Matthews was assaulted by Officer Lombardi after he attempted to leave his cell without his CCJ-issued shirt. Before he could fully exit his cell, Officer Lombardi instructed Matthews to put on the CCJ shirt. Plaintiff Matthews immediately complied and then attempted to exit his cell. Officer Lombardi refused to let him leave and slammed the metal cell door on Plaintiff Matthews' leg, causing excruciating pain

████████ ██████████

85.     During the Fall of 2013 in Division X, ████ █████ was abused by Officer ████ after he attempted to follow a Sergeant's order to exit his cell. As ████ attempted to comply with the Sergeant's order, Officer ████ slammed the cell door on ████ foot, crushing his foot and causing him excruciating pain.

████████ ██████████

86.     On July 6, 2013, in Division 10, Tier 3B, █████ was beaten by Officer Coven after Officer Coven attempted to intervene in a fight between █████ and another man on the tier. Officer Coven allowed the fight to go on for some time, and when he finally intervened he threw █████ up against the wall and choked him. When █████ tried to stop Officer Coven from choking him, the officer began beating him with his handcuffs. Then, another officer arrived and restrained █████ with cuffs and shackles and pushed him onto the floor. Officer Coven continued to beat █████ while he lay shackled on the ground.

87.     █████ was taken to the medical unit. The medical staff determined that he needed to be treated at the trauma unit at Stroger Hospital. █████ filed multiple grievances, about this incident but never received a response.

████████ ██████████

88.     During July 2013, in Division IX Officer Aljazi assaulted █████ as punishment for speaking to his cousin while they were both at the CCJ barbershop. After observing him speak to his cousin, Officer Aljazi began to torment and humiliate █████ by pulling the waist of his pants straight up to cause what is commonly referred to as a "wedgie." When █████ asked the officer to stop, Officer Aljazi responded by smashing █████ face

into the wall. Officer Aljazi then tried to instigate a fist-fight with ███████ but ███████

refused to rise to the bait. Officer Aljazi continued to taunt ███████ by calling him a "bitch."

**JOHN DOES 11-12**

89.     During the fall of 2013 on Division IX, on Tier 3D during the 3-11 shift, a

number of white officers beat down two Latino men after the men refused to move to another

tier. The men were not posing any threat to security. The officers appeared to have planned

the beat down and worked together to execute it. The officers went to the men's cells

slammed them against the wall, choked them and handcuffed them. The men were then

transferred to Division I.

**JOHN DOES 13-14**

90.     In November 2013, on Division IX in Tier 2E during the 3-11 shift, two men

were attacked by multiple officers after they refused to return to their cells because they

wanted the chance to speak with white shirts about their living conditions. The officers

responded to this request by slamming them on the ground, handcuffing them, grounding their

faces into the concrete floor and punching them on the sides of their bodies. Upon information

and belief, the officers continued to beat these men once they entered the elevator.

**JOHN DOE 15**

91.     During the fall of 2013 in Division IX, Officer O'Rourke attacked a Latino man. Officer O'Rourke asked the man to provide information about a fight that occurred on the tier. When the man refused to answer the questions, the Officer O'Rourke hit him behind the knees causing his legs to buckle. Doe fell to the ground and lay there while Officer O'Rourke beat and choked him.

      **C.**     **Officers target people with whom they have had a verbal disagreements for brutal, retaliatory beatings in which groups of officers participate.**

**JOHN DOE 16**

92.     During the fall of 2013 in Division IX, on the protective custody tier, Officer Ferro struck Doe in the face and knocked him unconscious. Once Doe was on the floor, 15 other officers arrived on the tier. They handcuffed him, pushed him against the wall, and bent his arm in a painful manner.

█████████  █████████████

93.     On August 6, 2013 in Division X officers attacked ████████  ████████████ in a stairwell. The attack was premeditated and committed as retaliation for an alleged verbal altercation ██████████ had with a female officer.

94.     The female officer ordered ██████████ to the stairwell under the pretext that he had a medical appointment. When he arrived, three other officers, including Officer Williams pounced on him. They beat ██████████ punching him in the jaw and hitting him all over his body. Once the beating ended, Officer Williams told ██████████ that if he told anyone about this incident, he would again be beaten by officers.

95.     When the officers returned ████████ to his living area, he asked for medical attention because he sustained injuries to his finger and jaw. The officers denied his request. ████████ continued to make requests to receive medical care and days after the incident he finally saw the nurse and received medical treatment.

96.     Five days after the attack on or about August 11, 2013, ████████ filed a grievance about the attack he endured. He heard no response until the week of October 20 2013, when an investigator met with him and asked him fill out another form documenting the attack. CCJ staff have provided no further response to his grievance.

**JOHN DOE 17**

97.     During the fall of 2013, in Division 10, Correctional Officer Toledo beat Doe after Doe called Officer Toledo a coward. Officer Toledo punched Doe in the face multiple times until the he appeared unconscious. Officer Toledo and another officer eventually dragged the Doe off the deck. At no time during or before this attack did the Doe act in a violent manner, resist Officer Toledo, or pose any threat to security.

**JOHN DOE 18**

98.     During October 2013, in Division IX, Officer Flores struck Doe in the back of the head the day after the two argued about a meal tray. Officer Flores hit Doe with such force that he was knocked unconscious and fell into Officer Flores' arms. Doe was bleeding profusely from the lacerations, and blood covered Officer Flores and the deck floor.

████████ ████████

99.     In November 2013, on Division IX, tier 3-F Officer Taylor assaulted ████████

████████ after he complained about the treatment he received in the CCJ school. Officer

Taylor responded to ████████ complaints by slapping him with an open hand, grabbing him

by the jumpsuit, throwing him against the wall and slapping him again. At no time during this

interaction was ████████ violent or resisting.

████████ ████████

101.     On January 6, 2014 in Division X Officer McHafferty assaulted ████████ ████████

a 57year old man. The attack began when Officer McHafferty insulted ████████ by calling him a

"punk ass." ████████ responded to him using similar language. Then the officer became violent.

He pushed ████████ against the wall and grabbed his legs, causing him to fall to the floor. Other

officers arrived on the tier, they yelled "stop resisting" even though ████████ was lying flat on the

floor. An officer proceeded to beat ████████ and twist his arms with the intention to inflict pain.

After this incident, ████████ received a disciplinary charge and was sentenced to 54 days in

segregation in an effort to cover-up the excessive use of force employed by Officer

McHafferty and the other officers.

████████ ████████

102.     During September 2013, in Division IX, an officer knocked ████████

unconscious after first taunting him because of his protective custody status. The officer

mocked ████████ by stating "you're a pussy [because] you're in PC." ████████ responded with

similar language but did not threaten the officer or behave in a physically aggressive manner.

The officer, however, did become aggressive and struck ████████ in the back of the head with

his radio. ██████ lost consciousness. When he came to, he was in the elevator and Officers O'Hearn and another officer were beating and stomping on him.

**JOHN DOES 19-20**

103.    In early 2013, in Division IX, Tier 2F, an officer attacked a man after instigating an argument with him. The officer began the incident by yelling at two men who were in their cell "y'all some bitches." The men responded with similar language, but were secure in their cells—they posed no danger to the verbally aggressive officer. The officer then escalated this situation by entering the cell and punching one of the men. Additional officers eventually come to the tier and restrained the man who was attacked by the instigating officer. While the man was restrained, the instigating officer continued to beat him while the other officers carried him off the tier.

██████  ██████

104.    On April 14, 2012 in Division 10, Tier 4-B, Officer Price attacked ██████ who was handcuffed at the time. After threatening ██████ Officer Price then restrained him with handcuffs and began beating him over the head with another pair of handcuffs, while pushing him off the tier. Once ██████ was outside the tier, Officers Price and Norico began violently kicking him in the head and stomach. At least two shift sergeants on duty observed this beating and did nothing to intervene.

**JERMAINE BROOKS**

106.     During the Summer of 2012, an officer attacked Plaintiff Brooks in Division IX. The attack occurred in the interlock between Tier 1E and 1F. Officers grabbed Brooks and threw him to the ground. Then they punched and kicked him. The officers beat Brooks until he had to be carried out of the interlock. Officers boasted to other people housed at the jail that Brooks was so injured, 911 had to be called to provide him with emergency medical care.

**JOHN DOE 21**

108.     In early November 2013 in Division 9, officers twisted Doe's ankle explicitly for the purpose of causing him excruciating pain after Doe had a verbal altercation with one of the officers. Witnesses to this incident heard a loud popping noise come from Doe's ankle. Once his ankle popped, one of the guards tapped the other who was beating him on the shoulder to signal that they needed to end the assault.

**JOHN DOE 22**

109.     During July or August 2013 in Division X, on Tier 4D, Officer "D. Roach" beat Doe during an "elevator ride" after the two men had a verbal altercation. During that altercation, the officer threatened Doe with an "elevator ride." A few hours later, Officer D. Roach and another officer came to Doe's cell and forced him into the elevator. While in the elevator, the officers beat Doe, causing him a black eye, bruises, and swelling on his head.

██████ ██████

110.   During August 2013, in Division IX on Tier 1F an officer beat ████ u until he was unconscious. ████ was handcuffed during this attack, which happened immediately after ████ and the officer had a verbal altercation.

██████ ██████

111.   In September 2013 in Division IX, Officer Zuniga assaulted ████ after the two had a verbal altercation. Officer Zuniga stood outside of ██████ cell, harassing him with racial slurs. ████ responded and the two began arguing. Officer Zuniga then entered ██████ cell and slapped him across the face in an attempt to instigate him into hitting back.

██████ ██████

112.   In early 2013 in Division IX, an officer assaulted ████ the day after the two had a verbal altercation over whether ████ was spending too much time on the telephone. The officer decided to retaliate against ████ for the previous day's altercation by refusing to allow ████ out of his cell—even though ████ was not on any official cell restriction or punishment. When ████ attempted to leave his cell the officer slammed the cell door on his foot. Then officer began to attack ████ punching him and slamming him to the ground. As a result of his beating, ████ had to attend court with blackened eyes and lacerations around his lips. He received medical care for the injuries he sustained during this attack.

██████ ██████

113.   At the end of December 2013, on Division X, Tier 3, ████ was attacked by a number of officers including a sergeant when he refused a command to move to the back of

his cell. ██ was locked in his cell, but standing near the door when Sergeant Howard commanded him to move. ██ refused. He was already secure in his cell and posing no threat to safety. Despite this fact, Sergeant Howard entered the cell and began to beat him. At some point Officer Ramirez and another officer entered the cell and began slamming ██ against the wall. After they finished the attack, Sergeant Howard instructed ██ that he better start listening to CCJ staff.

### III. CCJ STAFF OFTEN ORDER OR ENCOURAGE THE MEN HOUSED AT THE JAIL TO HARM EACH OTHER AND FAIL TO TAKE REASONABLE MEASURES TO PROTECT THEM FROM VIOLENCE

114. According to the DOJ Investigation in 2008, in a period of two months, there were seven different knife fights and high rates of assaults. The DOJ noted that many of these incidents happened in Divisions IX and X, which, as maximum security divisions, should be supervised at the highest level. The DOJ cited the following individual cases as proof that the Defendants failed to take reasonable steps to protect detainees from violence at the hands of other detainees:

    a.    In December 2007 in a Division IX dayroom, multiple men suffered stab wounds after a knife right. Six men required treatment from outside hospitals. Despite the seriousness of this incident, the Defendants failed to appropriately investigate this incident.

    b.    In June 2007, officers noted that several men from Division X, Tier 4B had stab wounds after a knife fight in the gym. One man was hospitalized with a stab wound and another for a broken jaw. The Defendants responded by placing the entire until on an extended lockdown for several weeks, but took no other efforts to address

conflict on the tier. When the lockdown ended in July, another fight broke out involving the same detainees who were involved in the earlier fight.

c.      In June 2007, two men from Division IX suffered injuries to their faces and heads after a fight occurred. Officers only found out about the fight after they observed the injured men. No officers observed the fight, but all the men involved, including one who broke up the fight, were placed in segregation.

d.      In May 2007, seven men were treated with stab wounds in Division IX. Three of these men had to be transferred to an outside hospital for treatment.

e.      In April 2006, two men were seriously injured in a gang fight on Division IX. Both were admitted to the hospital with multiple stab wounds to the back.

115.    The DOJ further concluded that "insufficient inmate supervision has been a serious problem at CCJ for decades. Inmate supervision is seriously compromised by chronic overcrowding and under-staffing. The federal district court monitoring the *Duran* Consent Decree repeatedly cited CCJ for failing to provide adequate security staff to ensure safe and secure conditions at the facility. In September 2006, then-Sheriff Michael Sheahan admitted that the jail is 'severely understaffed.'"

116.    To this day, Defendants continue this precise pattern and practice of failing to protect people from harm. Some officers use people locked up in the jail as pawns in their efforts to inflict violence on other people. Officers allow men from rival gangs or who are otherwise in conflict with each other to have ready access to each other, by popping their cell doors open, or arranging for them to be in the same place at the same time. Officers frequently leave the tiers unsupervised for long periods of time—providing ample opportunity for people to inflict great harm on each other.

117.     The Defendants do not require that officers inspect the tier at regular intervals and ensure that all people housed there are safe. Even if the officer is on the tier, he or she sits in the "bubble" area, sometimes falling asleep, sometimes chatting with co-workers, rarely paying attention to what is happening on the tier. When officers are present during incidents of violence, they often wait for the men to become seriously injured before intervening.

118.     Officers provide special privileges to men who attack other people housed at the jail at the command of officers. During violent attacks that were ordered or facilitated by officers, many men have been beaten to the point that they appeared unconscious. Others received medical treatment from CCJ staff and contractors including stitches or staples for bloody wounds, treatment for punched out teeth, and broken limbs.

119.     The CCJ's own incident reports during a two month period in 2013, describe such extreme levels of violence and dangerous contraband in Divisions IX and X, that both Divisions can only be described as out-of-control, chaotic and lawless.

120.     Defendants Preckwinkle and the County Board of Commissioners create these violent conditions by failing to provide sufficient resources to ensure reasonably safe living conditions for the men housed in Division IX and X of the Cook County Jail. These Defendants have been aware that the lack of resources creates an unreasonable risk of harm for people housed at the jail, yet for many years they have persisted in failing to ensure that the jail has appropriate resources.

## IV.    REPRESENTATIVE EXAMPLES OF VIOLENCE ARE PERVASIVE

**TYLON HUDSON**

120.    Plaintiff Tylon Hudson has been repeatedly threatened by Officer Campbell during his detention at the Cook County Jail because Defendant Campbell believes that Hudson was responsible for the murder of a family member. Officer Campbell informed Hudson that, at Officer's Campbell command, members of a well-known street gang would seriously harm—and likely kill—Hudson.

121.    On August 3, 2012, Lieutenant Johnson informed Hudson that credible and immediate threats had been made against his life. As a result, Defendant Johnson arranged for Hudson be moved to another tier.

122.    Shortly after Hudson was moved, Defendants Johnson and Campbell worked together to ensure that the gang members controlled by Campbell were placed on the same living unit with Hudson. These gang members continued to threaten Hudson at the command of Officer Campbell. One of the gang members spit on Hudson and told him that he was a dead man.

123.    After realizing that the men under Campbell's control had followed him to his new housing unit, Hudson then requested and eventually received protective custody ("PC"). After he had spent two weeks in PC on Division III South, Sergeant Lewis (who is now a Lieutenant) told Hudson that he had to leave protective custody. Hudson has epilepsy and as a result had to be placed in a PC unit that could care for his medical needs. Lewis informed him that people with more serious medical concerns needed his bed in PC, so he would be returned

to Division X. Lewis forced Hudson to leave PC, and in doing so disregarded the substantial risk of harm Hudson faced in Division X.

124.    Upon arriving back in Division X, on August 16, 2012, other men on Hudson's tier immediately informed him that the gang members under Campbell's control had obtained law library privileges and were intending to kill him in the law library. Hudson recently began representing himself in his criminal case and thus required regular law library access.

125.    Upon learning that one of the gang members under Campbell's control had access to the law library, Hudson requested that CCJ staff prevent the gang member and Hudson from being at the library at the same time. People who need to use the library are only scheduled to visit once a week for 90 minutes, so keeping Hudson and the gang member separate during their scheduled library time would not have imposed an administrative burden on CCJ staff.

126.    On September 4, 2012, Hudson went to the library. The gang member who had previously spit on him was in the library at the same time. He threatened Hudson's life. Hudson hurriedly gathered his papers and immediately left the library.

127.    On September 11, 2012, Hudson and the gang member were again at the library at the same time. As soon as Hudson realized that his would-be-attacker was present, he left. He reported this incident and the September 4, 2102 incident to the CCJ staff and filed a grievance requesting that CCJ staff prevent the man who was threatening him from entering the library during his scheduled library time.

128.    On September 17, 2012, Officer Wilson, the security officer at the law library informed Hudson that she received a directive stating that the gang member and Hudson were not to be in the library at the same time. The next day, Hudson went to the library. He was

engaged in his research when he overheard one of the law librarians call for the gang member to come to the library. Officer Wilson told Hudson to "be careful" because the gang member was on his way to library. Instead of making any effort to protect Hudson from the impending assault by preventing the gang member from entering the library or escorting Hudson back to his tier, Officer Wilson then resumed her post outside the library.

129.    Hudson began to quickly gather his things and attempt to leave the library. But he was not fast enough. The gang member entered the library and immediately began assaulting him. The gang member punched Hudson with a closed fist and slashed his face with a shank. He beat Hudson repeatedly until a male security officer ended the fight. By then, Hudson was covered in blood and suffered lacerations on his face and mouth. He received medical attention for these injuries.

130.    Defendants Johnson, Lewis, and Wilson knew of the great risk of serious bodily injury Hudson faced because of Officer Campbell and the gang members under his control. Yet, they refused to take reasonable efforts to protect Hudson from this attack.

131.    Defendant Campbell intentionally, sadistically and with wanton disregard for Hudson's rights ordered gang members to attack him. Such actions have no penlogoical justification and are done for the sole purpose of inflicting pain and retribution.

█████ ████████

133.    During the summer of 2013, in the protective custody tier of Division IX, a transgendered victim who goes by the name ████ was sexually assaulted. While ████ was in the shower, another person housed in the jail grabbed her, threw her to the ground and fondled her breasts.  Other people on the unit saw this happen and yelled for the assaultive person to stop. ████ reported this assault to the officer on duty and to Sergeant Jones. But they did

nothing to protect her. The person who assaulted her is a staff favorite and is assigned special jobs around the tier. Only after ███ reported the assault to the medical staff was she removed from the tier.

134.     This is not the only time Officers have allowed ███ to endure assaults at the hands of other people on protective custody. In June 2013, officers on the protective custody tier in Division IX regularly opened the cell doors of both ███ and another person in the middle of night. Officers opened both cells in order to allow the other person to beat ███ These beating left visible bruises—officers certainly knew that ███ was enduring serious physical harm. Despite this fact, the officers continued to facilitate these beatings by opening her cell door and allowing another person to enter her cell.

**JOHN DOE 23**

135.     On April 30, 2013 in Division IX, the officers on Tier 2-C abandoned their posts and left the tier unsupervised—and as a result a violent fight erupted. The officers knew that there was tension on the deck between many of the men and that violence was brewing. Despite this knowledge, the officers left the deck and unlocked select cell doors. A fight between at least a dozen different men broke out. Eventually, about 20 officers returned to the deck, but they waited for people to sustain serious injuries before they made any move to break it up. People on the deck who were not involved in the fight were injured in this melee, including one person who received stiches over his eye.

**MAC DOE**

136.     In Division X during the fall 2013, Doe was seriously beaten by another person housed at the jail during the 3-11 shift. Officers Carroll, Velazquez and others watched this

attack happen from the hallway but did nothing to stop it. They did not enter the tier until the beating was over. As a result of this attack, Doe suffered serious injuries that required medical attention.

██████████  ████████

137.    In January 2012, Division X, Tier 3-B, ████████  ██████ was attacked by other people housed in the jail.  Prior to the attack, █████ heard that other men wanted to harm him, so he requested from an officer permission to enter his locked cell. The officer refused this request and then abandoned the tier. This left █████ locked out of his cell and in the day room where he was vulnerable to attack. Almost immediately after the officer left, 12 people attacked █████ They stomped him, stabbed him the face with a piece of metal and knocked him unconscious. █████ received medical care for lacerations and a broken nose. He filed a grievance and a compliant with the Office of Professional Responsibility, but received no response from the Officer of Professional Responsibility. This attack was entirely preventable had the officer allowed █████ to return to his cell and manned his post.

██████████  ████████

138.    In June of 2013, in Division X██████  ██████ began informing officers that his cellmate was acting unstable and that he feared the cellmate was going to harm him in some way. On the night of June 29, the cellmate's behaviors began to escalate. ██████ urgently pleaded for the officers to come to the cell and separate the two men. The officers ignored █████ pleas. Shortly after █████ requested assistance from the officers, his cellmate attacked him, stabbing him with an ink pen five or six time in his left forearm.

███ received medical care for the injuries he sustained during this attack. This attack would have been entirely preventable had the officers heeded ███ pleas.

████████ █████████

139.    During June 2013, in Division X, another person housed at the jail stabbed ████████ ████ in the eye with a nail. ████████ brought his injury to the attention of the officers but they ignored him and refused to allow him to receive immediate medical care.

████████ █████████

140.    In 2011 ███ was attached by Officer Tedesco and Couch (details of the officer inflicted abuse are at ¶ 75 above). In response to these beatings, ███ filed a number of grievances and cooperated with an investigation conducted by the Office of Professional Responsibility.  On June 26, 2013, Officer Tedesco commanded a number of other people housed at the jail to beat ████ as payback for ██████ cooperation with the investigation. Prior to the attack, ████ knew his life was in danger and that Officer Tedesco had commanded other people to attack him. He requested protective custody from several officers, but CCJ staff refused his request and he was forced to endure a brutal, violent assault.

████████ ██████

141.    During the fall of 2013 on the protective custody deck of Division IX, a 250-pound man who is housed at the jail began calling ████ ████ names that included "bitch" "sissy" and "fag." The officers overhead these insults and should have known that this name-calling would likely lead to violence. Instead, the officers ignored this outburst. The large man was then emboldened and he began to beat on ████ (who weighs about 160 pounds). The

large man beat ████ all over his face and body, while the officers on protective custody stood outside the deck watching and laughing. After enduring this attack, CCJ staff placed ████ in segregation for 10 days.

████████ ████████

142.     During September 2012 in Division IX, ████ ████ was beaten by his cellmate after they argued about the remote control. ████ is 55 years old, takes multiple medications for his serious mental illness and is vulnerable. Despite these facts, the Defendants took no measures to keep ████ reasonably safe in Division IX. Instead, after ████ reported to the officer and sergeant on duty that he had been attacked by his roommate, they placed him in segregation for two days.

████████ ████████

143.     On or about January 12, 2014, two people began to fight in Division X, Tier 3C. The officers did nothing to break up the fight and instead allowed other people housed at the jail to attempt to intervene. Only after they failed to end the fighting (and after the fight had gone on for quite a while) did the officer call for back-up and attempt to end the violence.

████████ ████████

144.     During the summer of 2012, in Division IX, ████ ████ was stabbed by other people housed in the jail. Prior to the stabbing, ████ informed the officers that several men had a knife and that he feared that it would be used to harm himself or someone else. The officers told ████ to stop complaining and made no effort to confiscate the knife. The group of men armed with the knife eventually attacked ████ stabbing him multiple times. During

the attack, ███ called for the officers to intervene. But the officers just stood by and watched the attack and did nothing to save ███ from the serious injuries he sustained.

145.    After this incident, ███ was transferred to Division X from Division IX. There, officers harassed him and subjected him to retaliation because he filed a complaint about the attack he endured in Division IX. The then-Superintendent of Division IX threatened to send ███ back to Division X and let the people housed there kill him.

## V.    THE CONDITIONS IN THE ISOLATION UNITS IN DIVISIONS IX AND X ARE BARBARIC AND UNCONSTITUTIONAL

146.    In addition to the brutal physical force described above, the Defendants also rely on isolation and segregation to punish people housed in CCJ. It is well-established that the practice of locking human beings in a cell for 23 hours a day causes profound mental anguish and a documented risk of serious harm. Even short periods of isolation may have lasting, adverse mental health consequences. Juan Mendez, the United States Special Rapporteur on torture had concluded that even 15 days in solitary confinement constitutes torture and that 15 days is limit after which irreversible harmful psychological effects can occur. People housed in the CCJ are regularly forced to serve weeks and months in isolation units.

147.    These units, referred to as the "hole" or "seg," are unfit for human habitation. The cells are filthy, unsanitary, and infested with vermin. Raw sewage frequently floods the cells, creating serious risks to health and safety. People with mental health issues are disproportionately targeted for isolation sentences. In these brutal conditions, they decompensate quickly, screaming and throwing feces around the unit. The people confined in

these units are not provided with cleaning supplies. They are forced to eat and use the toilet in the same small, disgusting space.

148.    People in these units are locked down for 23, often 24, hours a day. Sometimes people go many days without being let out of their cells. On some units, people are forced to wear handcuffs and shackles when they are let of their cells—they must spend their hour of out of cell time handcuffed and shackled. The chains cause bruises on the men's limbs and make it almost impossible to move around when they freed from the cramped cells.

149.    The men in these units are generally allowed virtually no access to phone calls and visits with family.

150.    The men and the staff who work in these units have a saying "there's no sleep in the hole." People who are descending into psychosis scream, cry and bang on their cells at all hours of the day and night. It is almost impossible to sleep because of the constant noise and the stench of the unsanitary conditions. These conditions create extreme mental anguish for all and cause the onset of mental illness for some.

151.    The conditions in the isolation units are extremely different from the conditions throughout the rest of Divisions IX and X. On the other units, people are generally allowed out of their cells for six hours a day. They can use the phone freely and are regularly provided with cleaning supplies.  They are allowed recreation time—sometimes outside.

152.    Defendants Preckwinkle and the County Board of Commissioners allow these barbaric and unsanitary conditions to persist at the jail by failing to provide sufficient resources to ensure adequate training and oversight of CCJ staff and adequate upkeep of the physical plant. These Defendants have been aware that the lack of resources exposes people

housed at the jail to inhumane living conditions, yet for many years they have persisted in failing to ensure that the jail receives appropriate resources.

153.    Plaintiff Anton Carter received a disciplinary ticket for an incident that occurred on January 14, 2014.  However, the ticket was not issued until February 15, 2014. Because too much time had passed, he could no longer be charged with a disciplinary infraction or placed in segregation for disciplinary reasons.  However, Defendant Thomas told Plaintiff Carter that even though he could not be sent to segregation for disciplinary reasons, he would just be held in "administrative" segregation.  Plaintiff Carter told Defendant Thomas that these actions could lead to a lawsuit.  Defendant Thomas responded:  "Ain't my money, my paycheck is still the same."  Plaintiff Carter is held in inhumane segregation conditions in Division IX.

154.    Since at the winter of 2011, whenever Plaintiff Jermaine Brooks is housed at the Jail, CCJ staff place him s in administrative segregation on Tier 1-F in Division IX. (Brooks is sometimes confined in a neighboring jail because of the over-crowding problem at the CCJ). He was never given a disciplinary ticket prior to placement on this tier, nor has he been provided with an opportunity to earn his way out of administrative segregation. As a result of his placement on this tier, he is denied full access to the commissary, denied visitation, and denied the ability to use the phone. When is allowed out of his cell, CCJ staff shackle and handcuff him.  The conditions he has been held in are squalid and unsanitary—in one of his cells blood and mucus covered the floors. He has been present when other people housed on the tier throw feces. Plaintiff Brooks himself suffers from serious mental health issues including Schizophrenia, with major Depressive Disorder, and Post-Traumatic Stress Disorder. He has a history of suicide attempts and currently takes five different psychotropic

medications. The conditions in the segregation unit severely exacerbate his mental illness and cause him extreme anguish.

## VI.    EXHAUSTION OF ADMINSTRATIVE REMEDIES

155.    The named Plaintiffs have exhausted all available administrative remedies.

## COUNT I—EXCESSIVE USE OF FORCE AND SADISTIC TREATMENT
### (Eighth and Fourteenth Amendment Claim for Declaratory and Injunctive Relief Against All Official Capacity Defendants)

156.    Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count.

157.    Plaintiffs and the class they represent were deprived and continue to be deprived by the Defendants of their rights under the Eighth and Fourteenths Amendments to the United States Constitution to due process of law and to be free from excessive force, threats of excessive force, and sadistic treatment.

158.    The Defendants' failures to take appropriate steps to curb the widespread pattern of officer brutality in Divisions IX and X of the Cook County Jail, as described in the complaint, constitutes deliberate indifference to Plaintiffs' rights to be free from cruel and unusual punishment. Defendants know of and disregard a substantial risk of serious injury that people housed in the jail face at the hands of staff.

159.    Plaintiffs seek injunctive and declaratory relief against all official capacity Defendants to prevent the continued violation of the rights of Plaintiffs and the class they seek to represent.

## COUNT II—FAILURE TO PROTECT
### (Eighth and Fourteenth Amendment Claim for Declaratory and Injunctive Relief Against All Official Capacity Defendants)

160. The Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count. The Plaintiffs and the class they represent were deprived and continue to be deprived by the Defendants of their rights under the Eighth and Fourteenths Amendments to the United States Constitution to due process of law and to be provided with reasonably safe living conditions.

161. The Defendants' failures to take appropriate steps to curb the widespread pattern of violence in Divisions IX and X of the Cook County Jail, as described in the complaint, constitute deliberate indifference to Plaintiffs' basic need for reasonable protection from harm and violate Plaintiffs' rights to be free from cruel and unusual punishment. Defendants know of and disregard the substantial risk of injury created by violence amongst the people housed at the jail.

162. Plaintiffs seek injunctive and declaratory relief against all official capacity Defendants to prevent the continued violation of the rights of Plaintiffs and the class they represent.

## COUNT III- CRUEL AND UNUSUAL CONDITIONS IN THE ISOLATION/SEGREGATION UNITS
### (Eighth and Fourteenth Amendment Claim for Declaratory and Injunctive Relief Against All Official Capacity Defendants)

163. Plaintiffs repeat and re-allege the preceding paragraphs as if fully set forth in this Count. Plaintiffs and the class they represent were deprived and continue to be deprived by the Defendants of their rights under the Eighth and Fourteenths Amendments to the United States Constitution to be free from cruel and unusual punishment.

54

164.     Defendants' operation of filthy, unsanitary, unduly restrictive, and inhumane segregation units in which people are locked in their cells for more than 23 hours a day, as described in the complaint, constitutes cruel and unusual punishment.

165.     Plaintiffs seek injunctive and declaratory relief against all official capacity Defendants to prevent the continued violation of the rights of Plaintiffs and the class they seek to represent.

## COUNT IV—SADISTIC TREATMENT OF PLAINTIFF HUDSON

### (Eighth and Fourteenth Amendment Claim for damages against Defendant Officer Campbell)

166.     Plaintiff Hudson repeats and re-alleges the preceding paragraphs as if fully set forth in this Count. Plaintiff was deprived by the Defendant Campbell of his rights under the Eighth and Fourteenths Amendments to the United States Constitution to be free from cruel and unusual punishment.

167.     Defendant Campbell intentionally, sadistically and with wanton disregard for Hudson's rights ordered gang members to attack him. Such actions have no penlogoical justification and were done for the sole purpose of inflicting pain and retribution.

168.     As a result of Defendant Campbell's actions, Plaintiff Hudson's constitutional rights were violated and he suffered damages.

## COUNT V—FAILURE TO PROTECT PLAINTIFF HUDSON

### (Eighth and Fourteenth Amendment Claim for damages against Defendants Lewis, Wilson and Johnson)

169.    Plaintiff Hudson repeats and re-alleges the preceding paragraphs as if fully set forth in this Count. Plaintiff was deprived by the Defendants Lewis, Wilson, and Johnson of his rights under the Eighth and Fourteenths Amendments to the United States Constitution to reasonably safe living conditions.

170.    Defendants Johnson, Lewis and Wilson knew of the great risk of serious bodily injury Hudson faced because of Officer Campbell and the gang members under his control. Yet, they refused to take reasonable efforts to protect Hudson from attack.

171.    As a result of Defendant Johnson, Lewis and Wilson's actions and inactions, Plaintiff Hudson's constitutional rights were violated and he suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in their favor and against the Defendants in the following manner:

1.    Enter an Order certifying a class of all people who now or in the future will be housed in Divisions IX and X of the Cook County Jail.

2.    Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of Plaintiffs and the class they seek to represent under the Eighth and Fourteenth Amendments to the United States Constitution.

3.    Enjoin the Defendants, their agents, employees, and all persons under their control from subjecting Plaintiffs and the class they seek to represent from the unlawful policies, practices, and conduct described in this Complaint.

4.      Retain jurisdiction of this case until such time as the Defendants have fully

complied with all orders of the Court, and there is reasonable assurance that the Defendants

will continue to comply in the future with these orders.

5.      Award Plaintiffs reasonable attorneys' fees, costs, and expenses pursuant to 42

U.S.C. § 1988.

6.      Award Plaintiff Hudson compensatory and punitive damages.

7.      Award Plaintiffs and the class they seek to represent such other and further

relief as the Court deems just and proper.


Respectfully submitted,


/s/   David Shapiro_____

Sheila A. Bedi (*Pro hac vice* motion to be filed)
David Shapiro
Locke E. Bowman
Alexa Van Brunt
Roderick MacArthur Justice Center
Northwestern University School of Law
357 E. Chicago Avenue
Chicago, Illinois  60611
(312) 503-0844

Alan Mills
Uptown People's Law Center
4413 N. Sheridan
Chicago, Illinois 60640
(773)769-1411

Counsel for the named Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that he filed the foregoing document via the Court's CM/ECF system and served a copy on the individuals in the attached service list, on February 27, 2014.


/s/    David Shapiro

<u>**SERVICE LIST**</u>

*Preckwinkle v. Hudson*

13cv8752

Nicholas Scouffas
Deputy General Counsel
Cook County Sheriff's Office
50 W. Washington, 7th Floor
Chicago IL 60602
312-603-8856

Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, Illinois 60640
(773) 769-1410