IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TYLON HUDSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 13 CV 8752 |
| TONI PRECKWINKLE, in her Official | ) | |
| Capacity as President of the Cook County Board | ) | Judge Kendall |
| of Commissioners; THOMAS J. DART, in his | ) | |
| Official Capacity as Cook County Sheriff; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT

## TABLES

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... i

## TABLE OF CONTENTS

**Page**

I.      Introduction ......................................................................................................... 1

II.     Standards of Expert Opinion Admissibility ................................................... 2

III.    Expert Reliance on Attorney Summaries and Data is not an Acceptable Expert Methodology and Render Opinions Inadmissible ......................................... 4

IV.     Dr. Schwartz's Opinions on "Alarming Rate of Violence," "Extraordinary Frequency of Violence" and "Widespread Violence" are Otherwise Inadmissible ......................................... 10

A.      Inmate Anecdotes Cited Do Not Reliably Support Sweeping Conclusions ................ 10

B.      Dr. Schwartz Provides No Useful Statistical Data ........................................... 13

V.      Other Opinions Demonstrate Dr. Schwartz's Improper Methodology ........................... 17

VI.     Conclusion ......................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................................ *passim*

*Huey v. United States Parcel Service, Inc.*,
    165 F.3d 1084 (7th Cir. 1999) ........................................................... 15, 18

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137, 119 S.Ct. 1167 (1999) ................................................... 3, 5

*Lewis v. CITGO Petroleum Co.*,
    561 F.3d 698 (7th Cir. 2009) ..................................................................... 2

*Loeffel Steel Products, Inc. v. Delta Brands, Inc.*,
   387 F.Supp.2d 794 (N.D.Ill. 2005) ...........................................................................4, 13

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*,
   877 F.2d 1333 (7th Cir. 1989) ...................................................................................19

*Mihailovich v. Laatsch*,
   359 F.3d 892 (7th Cir. 2004) ......................................................................................3

*Obrycka v. City of Chicago*,
   2012 WL 4092653 (N.D.Ill.) .....................................................................................15

*Obrycka v. City of Chicago*,
   792 F.Supp.2d 1013 (N.D.Ill. 2011) .........................................................3, 5, 6, 14

*Sommerfield v. City of Chicago*,
   254 F.R.D. 317 (N.D.Ill. 2008).............................................................3, 4, 5, 16

*Phelan v. Cook County*,
   463 F.3d 773 (7th Cir. 2006) ....................................................................................12

*Tyus v. Urban Search Mgmt.*,
   102 F.3d 256 (7th Cir. 1996) ..................................................................................3, 4

*U.S. v. Mamah*,
   332 F.3d 475 (7th Cir. 2003) ....................................................................................19

*U.S. v. Martin*,
   2000 WL 1029188 (N.D.Ill.) ....................................................................................14

*Victory Records, Inc. v. Virgin Records America, Inc.*,
   2011 WL 382743 (N.D.Ill.) ......................................................................................16

*Zenith Electronics v. WH-TV Broadcasting*,
   395 F.3d 416 (7th Cir. 2005) ..............................................................................15, 18

## Other Authorities

F.R.E. Rule 702........................................................................................... *passim*

F.R.Civ.P Rule 26 ......................................................................................................13

130893411v1 0958932

Defendants, THOMAS J. DART, in his Official Capacity as Cook County Sheriff, and the Sheriff's Office Defendants, move this Honorable Court to bar plaintiffs' expert, pursuant to F.R.E. Rule 702, *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, and in support thereof, state as follows:

## I.    Introduction

Plaintiffs have disclosed Dr. Jeffrey Schwartz as a correctional agency expert witness. (Exh. A, Schwartz Expert Report, June 17, 2014; Exh. B, Schwartz Supplemental Expert Report, June 29, 2014). Dr. Schwartz's opinions address the policies and practices regarding staff use of force and inmate-on-inmate violence in Divisions IX and X at the Cook County Jail. (Exh. A, p. 2, Section II, "Objectives"). While his 65-page initial report and 9-page supplemental report are filled with sensational anecdotes and sweeping impressions, all of Dr. Schwartz's conclusions are premised upon his underlying opinion that inmates in Divisions IX and X are experiencing violence at "alarming rates." (Exh. A, p. 7, Section IV(A), "Summary of Findings"). According to Dr. Schwartz, there is an "extraordinary frequency of violent incidents," involving "serious" injuries, which have resulted from widespread excessive force by officers and a failure to protect against detainee on detainee violence. (Exh. A, p. 7-8, 18). From this conclusion, Dr. Schwartz offers up his opinions of "systematic failures," which have purportedly caused the pervasive harm to occur, including a "lack of accountability," a "problematic use of force policy," a "culture of abuse," a "code of silence," "lack of direct supervision," and a "seriously deficient reporting process." (Exh. A, p. 7-8, 18).

However, for the bases of his opinions, Dr. Schwartz impermissibly accepted and relied upon numerous biased summaries of data prepared by the plaintiffs' attorneys, including deposition summaries, use of force report summaries, incident report summaries, disciplinary report summaries, OPR investigation file summaries, and video summaries. Dr. Schwartz

impermissibly accepted and adopted the plaintiffs' attorneys' conclusions and made them his own. In some cases, Dr. Schwartz simply dictated or cut and pasted from the slanted attorney perceptions and conclusions right into his report. As case law instructs, this is an unreliable and unacceptable expert methodology. Given the vast scope of the provided attorney material relied upon by Dr. Schwartz, all of his opinions are tarnished with unreliability and must be excluded.

While Dr. Schwartz's collaborative effort with the plaintiffs' attorneys is reason alone to exclude him as an expert witness, his opinions are otherwise unreliable under Rule 702. As fully discussed below, his broad opinions lack sufficient data to support them, are not the product of reliable principles and methods, and provide nothing but an unsupported bottom line. Defendants now move to bar such opinions as wholly unreliable.

## II.    Standards of Expert Opinion Admissibility

Federal Rules of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony in federal court. *Lewis v. CITGO Petroleum Co.*, 561 F.3d 698, 705 (7th Cir. 2009). Rule 702 provides that:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Under *Daubert*, the district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission. *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167 (1999)). The insistence on reliability helps ensure the integrity of the judicial process and is of such transcendent importance that

130893411v1 0958932

judges can act *sua sponte* to prohibit testimony that does not pass muster under *Daubert*. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 318 (N.D.Ill. 2008) (Cole, J.) (citations omitted). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard. *Obrycka v. City of Chicago*, 792 F.Supp.2d 1013, 1019 (N.D.Ill. 2011) (St. Eve, J.).

When evaluating the factors bearing upon reliability under Rule 702, "the focus is not on the expert's conclusions, but on the underlying methodology." *Sommerfield,* 254 F.R.D. at 319 (citing *Daubert*, 509 U.S. at 593-95). Among the factors to consider in gauging an expert's reliability are whether: 1) the testimony relates to matters growing naturally and directly out of the research that was conducted independently from the instant litigation; 2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; 3) the expert has adequately accounted for obvious alternative explanations; 4) the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and 5) the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving. F.R.E. Rule 702, Advisory Committee Notes.

An expert must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire Co.,* 526 U.S. at 152. Also, *Daubert's* framework for assessing expert testimony is applicable to social sciences, just as it applies to experts in the hard sciences. *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). The opportunity for vigorous cross examination and the presentation of contrary evidence—the traditional and appropriate means of attacking shaky but admissible evidence—is not a basis for allowing otherwise inadmissible testimony to be admitted. *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 800 (N.D.Ill. 2005).

3

### III.     Expert Reliance on Attorney Summaries and Data is not an Acceptable Expert Methodology and Render Opinions Inadmissible

An expert's reliance on party attorneys' summaries of depositions and data is not an acceptable expert methodology. *Sommerfield*, 254 F.R.D. at 321-28.  In *Sommerfield*, all of the opinions in the plaintiff's expert report were deemed unreliable and were excluded because they were based (in part) on the plaintiff's lawyer's summaries of depositions.  *Id*.

In assessing the reliability of attorney summaries, Judge Cole reasoned, "(c)onsistent with the role of an advocate in our adversary system, it is assumed that counsel 'is supposed to give the evidence a partisan slant.'"  *Id*. at 322 (quoting *Phillips Medical Systems Intern. B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir. 1993)).   "Under a realistic appraisal of psychological tendencies and human weakness, a lawyer attempting to fulfill his obligations to his client and also trying to summarize depositions with the accuracy required to insure reliability is apt to be a poor summarizer, a poor advocate, or both." *Id.* (quoting *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456 (1975)).

Judge Cole further noted that "(r)ejecting a lawyer's summarization of depositions as a basis for expert opinion is consistent with the law's wariness of information prepared for litigation."  *Id.* at 323.   Indeed, "documents prepared specifically for use in litigation are 'dripping with motivations to misrepresent.'"  *Id*. (quoting *Hoffman v. Palmer* 129 F.2d 976, 991 (2nd Cir. 1942).  As such, "(a)cceptance of the notion that an expert can reasonably base his opinion on summaries of deposition testimony prepared by a party's lawyer would effectively eliminate *Daubert's* insistence that an expert's opinion be grounded on reliable information."  *Id.* at 321.

Additionally, the "excuse" that the expert did not have enough time was deemed "singularly unconvincing," as the answer is "not to allow an expert to rely on unreliable

4

evidence, but rather to seasonably hire experts and failing that to ask the court to extend the expert discovery cut-off." *Id*. at 327. According to Judge Cole, "doing neither in hopes that the strictures of *Daubert* and *Kumho Tire* could be relaxed is not an option. *Id.*; see also *Obrycka v. City of Chicago*, 792 F.Supp.2d at 1020-21, 1028 (plaintiff's proposed police expert excluded because he relied on certain materials provided by plaintiff's counsel which contained summaries of evidence).

Of significance, it does not matter that plaintiff's counsel also provided the expert with the underlying data. As the court held in *Obrycka*,

> "Although Plaintiff's counsel did produce to (the proposed expert) the primary source documents that they summarize, selectively quote from, and otherwise cite in their Outlines, the manner in which (the proposed expert) seems to have uncritically relied solely on Plaintiff's Outlines—which are, again, Plaintiff's roadmap of the case and the evidence her counsel has identified as supporting her claims—is not 'good science' or sound methodology, and it does not provide a reliable basis upon which (the proposed expert) may credibly state that all of his opinions 'reflect a reasonable degree of scientific certainty within [his] field of expertise, criminal justice, and police studies.'"

*Id*. at 1026.

The same unreliable methodology used by the proposed experts in *Sommerville* and *Obrycka* was employed in this case by Dr. Schwartz, despite his express acknowledgment that experts need to review data in an independent, non-suggestive, and unbiased manner to ensure that opinions are objective and impartial. (Exh. C, Deposition of J. Schwartz, July 3, 2014, p. 153). Notwithstanding, Dr. Schwartz readily accepted and relied upon extensive summaries and materials prepared the plaintiffs' attorneys (far more than the proposed experts in *Sommerville* and *Obrycka*). To make reliability matters worse, Dr. Schwartz uncritically adopted the opinions and conclusions of the attorneys, and in some instances, actually cut-and-pasted or dictated right from attorney summaries and attorney emails into his report.

In support of his opinion that inmate violence occurs at "alarming rates," under the heading, "Frequency and Severity of Violence Divisions IX and X," Dr. Schwartz focuses on the produced inmate disciplinary reports from Divisions Nine and Ten for a two month period in 2013. (Exh. A, p. 12). Dr. Schwartz claims he reviewed these reports and determined that out "of the more than 400 disciplinary reports, 152 were for incidents of physical violence." (Exh. A, p. 12). He then declares that based on these figures, the rate of violent incidents "is a picture of a jail out of control." (Exh. A, p. 12).

When questioned about this opinion, Dr. Schwartz conceded that he never reviewed all the disciplinary reports and instead relied on an email from plaintiff's attorney for the data analysis. (Exh. C, p. 155-56; Exh. D, February 21, 2014 email from D. Shapiro). More specifically, he conceded that it was plaintiffs' attorney who supplied him with the figure of 152 purported incidents of physical violence. (Exh. C, p. 156-57). Because of purported time constraints, Dr. Schwartz admitted that he did not complete his own analysis to determine which incidents involved physical violence, but rather solely relied on the plaintiffs' attorneys. (Exh. C, p. 157-58).[1] Dr. Schwartz does not know how the attorneys arrived at their conclusions, how they defined physical violence, how many of the 152 disciplinary reports were prepared for the same incident (*i.e.*, mass fights among inmates), or *how many incidents resulted in any inmate injuries*. (Exh. C, p. 225-231).

Dr. Schwartz's reliance on the attorneys' biased reviews of the evidence does not end there. Dr. Schwartz conceded that he was given deposition summaries from plaintiffs' attorneys, which included key testimony typed in bold font. (Exh. C, p. 158-60; Exh. F). These summaries

---

[1] Significantly, Dr. Schwartz was in possession of these disciplinary reports before he issued his initial declaration, which was attached to plaintiffs' amended complaint, filed on February 27, 2014. (Exh. E, Dr. Schwartz Declaration, p. 8). While it is not a legitimate excuse for Daubert purposes, Dr. Schwartz's claims as to time constraints also appear to be dubious.

included the depositions of Executive Director Cara Smith and four 30(b)(6) witnesses, and consist of a total of 21 single-spaced pages. (Exh. F). According to Dr. Schwartz, these summaries provided him with a "bit of a road map." (Exh. C, p. 159). More than that though, a review of the attorney summaries reveals instances where Dr. Schwartz simply copied (or cut-and-pasted) the attorneys' synopses verbatim into his report and then were used to support opinions. (Compare Exh. A at p. 35, where Dr. Schwartz describes Sgt. Larry Schurig's deposition testimony (in different font), with Exh. F, p. 20, attorney summary of Sgt. Schurig's testimony, under the Section, "Camera and video").

In his so-called independent review, Dr. Schwartz also accepted 33 pages of "Cook County Jail Use of Force Report Summaries" from plaintiffs' attorneys. (Exh. C, p. 161-62; Exh. G). These summaries contain the plaintiffs' attorneys' criticisms of use of force reporting by officers. These same criticisms then appear in Dr. Schwartz's report as his own criticisms. (Exh. C, p. 163).

Indeed, the use of force report summaries begin with an executive summary page in which plaintiffs' counsel initially states, "(a)s a preface to the tables, I thought it was important to note some of the trends I noticed throughout the reports." (Exh. G, p. 1). The executive summary then lists out some of the overall problems from plaintiffs' counsel's perspective, including claims that officers were using the same language repeatedly or copying verbatim from other officer reports, and that video footage frequently was not located. (Exh. G, p. 1). These attorney comments became Dr. Schwartz's exact criticisms regarding use of force reporting and review. (Exh. A, p. 35-37 (see Nos. 3, 4 and 7), and p. 41). Dr. Schwartz also acknowledged that there are instances where he used the attorneys' narratives in the use of force summaries verbatim in his expert report. (Exh. C, p. 169-70). Given that admission, it is certainly ironic

that Dr. Schwartz wants to criticize "plagiarism" in the use of force reports. (Exh. A, p. 41, under the Section, "The OPR investigations are incompetent").[2]

Plaintiffs' counsel's substantive input and influence on Dr. Schwartz's conclusions also extends beyond documentary evidence. Despite having provided Dr. Schwartz with all the videos produced by the defendants, plaintiffs' attorneys further sent Dr. Schwartz emails with links to specific video excerpts, with directions along the lines of "I've bolded the ones I think are most worth your time…" (Exh. C, p. 181-83; Exh. L).

When asked whether he found this attorney guidance to be suggestive, Dr. Schwartz testified that while he looked at "some of these videos on (his) own … (t)here were too many videos to look at everything." (Exh. C, p. 183). Dr. Schwartz was not sure if he had previously seen the suggested videos in his own review of the materials. (Exh. C, p. 186). Nonetheless, the videos suggested by the attorneys ended up in his report. (Exh. C, p. 182, 184-85). Highlighting Dr. Schwartz's collaborative effort with the party advocates, Dr. Schwartz admitted that he

---

[2] There are many other similar examples of Dr. Schwartz adopting biased attorney work product. For example, in connection with the issue of reporting, Dr. Schwartz readily represents additional opinions of plaintiffs' counsel as his own. For example, plaintiffs' counsel sent Dr. Schwartz an email with his opinion about the Sheriff's Office not complying with the policy for reporting serious or unusual incidents to the Illinois Department of Corrections. (Exh. C, p. 176-81, Exh. H). Dr. Schwartz uncritically plugged this attorney's opinion into his report. (Exh. A, p. 37, No. 6).

Additionally, Dr. Schwartz received 27 pages of "OPR File Review Summaries" from plaintiffs' attorneys. (Exh. C, p. 170-71; Exh. I). Each of these summaries provided Dr. Schwartz with a snapshot of what the attorneys deemed relevant about an OPR investigation, including who was interviewed, who was not and the attorneys' take on credibility determinations. (Exh. C, p. 171-75). The attorneys' (or law students') conclusions then became Dr. Schwartz's criticisms of OPR in his report. (Exh. C, p. 171-75).

Upon close examination, out of the 8 OPR investigations specifically criticized in Dr. Schwartz's report, in at least four instances, Dr. Schwartz copied the attorneys' slanted narratives and conclusions into his report, almost word for word. (See Exh. A, p. 45-53, and compare with Exh I, OPR File Review summaries for B. Heard, J. Gentry, T. Strong, and Y. Robinson). In other instances, outside of his criticisms of OPR, Dr. Schwartz again copied and used the attorneys' biased descriptions of incidents in the OPR File Review summaries as his own. (See for ex., Exh. A, p. 13 (L. Serrano incident), and compare with Exh. I, OPR File Review summary for L. Serrano).

Plaintiffs' attorneys provided Dr. Schwartz with numerous other summaries of incidents and detainees, which contained descriptions and bullet-pointed excerpts deemed relevant by the attorneys or perhaps law students. (Exh. C, p. 192, 197-98; Exhs. J and K). For example, Dr. Schwartz received "Detainee disciplinary summaries," totaling 39 single-spaced pages, and detainee-specific summaries of various jail records, totaling 17 single-spaced pages. (Exhs. J and K). Dr. Schwartz conceded that he may have "cut and pasted" from these summaries right into to his report. (Exh. C, p. 193-94).

simply dictated the provided attorney perception and description of what is purportedly shown and heard in one video into his report _word for word_. (*Id*., p. 187-192). Thus, it is clear that Dr. Schwartz relied on and copied the attorneys' perceptions and descriptions for numerous videos relied on for his report.[3]

According to Dr. Schwartz, it would be "far preferable to simply look at everything myself," but he claims in an equally unreliable and irrelevant sense that he was pressed for time. (Exh. C, p. 195) ("(h)ad I had time, I wouldn't have needed anybody's road map or suggestions about anything"). This "time pressure" also purportedly contributed to Dr. Schwartz plugging attorney information into his report "verbatim." (Exh. C, p. 274-75). Consequently, Dr. Schwartz accepted the plaintiffs' attorneys' suggestive conclusions and "used their words" in preparing his report. (Exh. C, p. 31). Ultimately (and to put it mildly in this case), Dr. Schwartz himself conceded that "suggestions" can compromise the nature of an independent review by an expert. (Exh. C, p. 196).

Given the vast scope of the biased attorney summaries and suggestions provided to and relied upon by Dr. Schwartz in support of opinions, along with the unrestrained manner in which Dr. Schwartz simply adopts (and copies) the attorneys' conclusions as his own, none of Dr. Schwartz's opinions can pass muster under *Daubert*. Indeed, the suggestive information and provided conclusions touch upon every aspect of his proposed testimony, including but not limited to the frequency of violence, inmate-on inmate incidents, use of force practices, reporting

---

[3] Compare Exh. A, p. 14, under "Anthony Newburn," containing quoted excerpts of what purportedly can be heard on video of the incident, with Exh. L, June 16, 2014 email from S. Bedi, p. 1 under "Anthony Newburn," containing the attorneys' quoted excerpts on what purportedly can be heard on the videos of the same incident (PJM 10629 and PJM 10634). Compare Exh. A, p. 17(m) (describing PJM 10670) with Exh. L, June 16, 2014 email from S. Bedi, p. 2 under "Yuron Robinson," describing video PJM 10670. Compare Exh. A, p. 29 (first full paragraph), describing "Video PJM 10676," with Exh. L, June 16, 2014 email from S. Bedi, p. 2, describing PJM 10676. Compare Exh. A, p. 29 second full paragraph, describing "Video PJM 9978," with Exh. L, June 16, 2014 email from S. Bedi, p. 2, describing PJM 9978).

130893411v1 0958932

and investigations. Notwithstanding time constraints, relying on the party advocates to form and flesh out opinions and to identify supporting bases is an unreliable expert methodology and his testimony must be barred.

### IV. Dr. Schwartz's Opinions on "Alarming Rate of Violence," "Extraordinary Frequency of Violence" and "Widespread Violence" are Otherwise Inadmissible

#### A. Inmate Anecdotes Cited Do Not Reliably Support Sweeping Conclusions

Dr. Schwartz's opinion that Division IX and X inmates are experiencing violence at "alarming rates," is otherwise unreliable for additional reasons. Beyond the disciplinary reports analyzed and interpreted by the plaintiffs' attorneys for Dr. Schwartz, he then cites only 14 incidents of alleged excessive force and inmate-on-inmate violence, based mostly on unquestioned inmate statements, to support his opinion that there is an "extraordinary frequency of violent incidents." (Exh. A, p. 12-17). Putting aside the fact that his discussion of these incidents is inherently unreliable due to the attorney input described above, and even assuming the truth of the inmate anecdotes, this small number of incidents over a period of years could not be considered extraordinary for maximum security divisions that house approximately 2,000 inmates at any given time. (Amended Complaint, Dkt.# 12, ¶ 1). Indeed, Dr. Schwartz agrees that excessive force by officers and inmate-on-inmate violence occurs even at the best jails, and maximum security inmates are more prone to violence than inmates housed in lesser security divisions. (Exh. C, p. 23, 26). He also recognized that in maximum security divisions, like Divisions IX and X, serious gang conflicts can erupt with little warning. (*Id.*, p. 21).

Given this perspective on Divisions IX and X, and when viewed in the context of Section 1983 claims against municipal entities, the alleged anecdotes relied on by Dr. Schwartz do not allow him to reliably infer, nor do they demonstrate, a widespread pattern (this is especially true

given the lack of any useful statistical data as described below). As the Seventh Circuit has instructed,

> "the word 'widespread' must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence that the unlawful practice was so persuasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision."

*Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006).

Also, to the extent Dr. Schwartz has purportedly relied on alleged incidents outside of his reports and testimony, these purported bases must be barred from testimony. "Recognizing that secrecy is not congenial to truth seeking, [Rule 26] requires that an expert report must disclose 'a complete statement of all opinions to be expressed *and* the basis and reasons therefor.'" *Loeffel Steel Products, Inc.*, 387 F.Supp.2d at 818 (quoting *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004)) (emphasis in original).

At his deposition, when asked to identify all of the serious inmate injuries he found to have resulted from officer use of force, Dr. Schwartz claimed that he could not answer by memory. (Exh. C, p. 205). He then explained that his report does not include all the serious inmate injuries by officer use of force that he purportedly found in his review of materials. (Exh. C, p. 205-06, 211-12). In addition to the alleged inmate injuries found in his report, Dr. Schwartz claimed there were more, but he didn't put them in his report, or otherwise make a list, because of "time or repetitiveness." (Exh. C, p. 208-09). While Dr. Schwartz acknowledged that he understood the difference between widespread pattern and isolated occasions, and admitted that he understood that experts are required to provide the underlying data for their conclusions, Dr. Schwartz nonetheless claimed he relied on undisclosed alleged incidents to form the basis of his opinion on widespread pattern of violence. (Exh. C, p. 209-212, 216-17).

11

Similarly, with regard to alleged inmate injuries resulting from inmate-on-inmate incidents, Dr. Schwartz only could recall three such inmates at his deposition. (Exh. C, p. 220-223). Dr. Schwartz further claimed that there are other serious injuries, allegedly resulting from inmate-on-inmate violence, that are not in his report and which form the basis of his opinion that inmates experience violence at alarming rates. (Exh. C, p. 223-24).[4]

As defendants would have no meaningful way to investigate and adequately cross examine Dr. Schwartz on undisclosed bases for his opinions, any alleged incidents or injuries not contained in his reports or testimony must be barred. Regardless of Dr. Schwartz's belief that disclosing all the bases for his opinion on the "extraordinary frequency" of violence would be time consuming and repetitive, it is necessary and required. See *U.S. v. Martin*, 2000 WL 1029188 *4 (N.D.Ill.) (rejecting expert's contentions that she has no obligation to provide facts and data supporting her opinions and that she was sparing the court of the burden of reviewing lengthy documents).

Given the critical significance of opinions that touch upon the basis for any official capacity liability in this case, Dr. Schwartz certainly needs to provide sufficient facts to support such conclusions. In providing a sprinkling of inmate anecdotes over the last few years, in maximum security divisions that house 2000 inmates, Dr. Schwartz does not provide sufficient data to reliably draw the blanket conclusions that inmates are experiencing violence at "alarming rates" and with "extraordinary frequency," or that there is a "widespread pattern" of violence. Even though an expert is allowed to accept one side's version of an event, he may not

---

[4] As an additional example, when Dr. Schwartz was asked about the basis for his opinion that "officers believe that unless inmates are afraid of staff, there would be widespread chaos and worse," he testified that he only had a vague recollection of a couple of unidentified videos. When asked if all the underlying data for that opinion was in his report, he admitted that it was not, and that it would be too burdensome to list all the incidents that form the basis of his opinion. (Exh. C, p. 292-95).

130893411v1 0958932

"unjustifiably extrapolate from an accepted premise to an unfounded conclusion." F.R.E. Rule 702, Advisory Committee Notes. (See also *Obrycka v. City of Chicago*, 792 F.Supp.2d at 1027, "It contorts the scientific method to turn one data point—cherrypicked by Plaintiff's counsel, no less, and uncritically adopted—into a general conclusion."). As the discussion below demonstrates, Dr. Schwartz's broad conclusions are unsupported and baseless.

### B. Dr. Schwartz Provides No Useful Statistical Data

While Dr. Schwartz posits that Division IX and X inmates experience violence at "alarming rates" and with "extraordinary frequency," he concedes that he does not know what the rates of violence really are. According to Dr. Schwartz, there are "no reliable indicators" for such rates and "it's all inferential." (Exh. C, p. 276). However, any inferences must be "reliable," and they "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Zenith Electronics v. WH-TV Broadcasting*, 395 F.3d 416, 419-20 (7th Cir. 2005).

Despite the fact that Dr. Schwartz claims to have worked with hundreds of jails across the nation over 35 years, he sets forth no correctional agency thresholds, standards, or points of reference from which to evaluate. When making his conclusory inferences on the "extraordinary frequency" of violence in Divisions IX and X, he provides no helpful statistical analyses or comparisons whatsoever. However, valid statistical comparisons are certainly useful in the context of reliable expert conclusions in civil rights cases. See, *e.g.*, *Obrycka v. City of Chicago*, 2012 WL 4092653 *6-8 (N.D.Ill.) (city's police expert's quantitative conclusion that CPD had a

130893411v1 0958932

lower number of excessive force complaints compared to other police departments was deemed both reliable and relevant).[5]

Aside from the attorney-fed numbers on the disciplinary reports (for which he did no analysis), Dr. Schwartz's report and testimony are devoid of statistical data on inmate-on-inmate violence. For example, he provides no data from other correctional facilities to compare against the plaintiffs' attorneys' analysis. (Exh. C, p. 231-32). While Dr. Schwartz acknowledges that such a statistical comparison "does place things in perspective," he did not find it "practical to get all of that data from other jails." (Exh. C, p. 232-234).

Dr. Schwartz did attempt to provide statistical comparisons on use of force incidents to support his opinions on the "alarming" rate of violence; however, his comparisons are flawed and legally useless. When experts make comparisons, "care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" *Sommerfield*, 254 F.R.D. at 336 (citations omitted). As it turns out, when "apples are compared to apples," Dr. Schwartz's provided data actually supports the fact that Cook County Jail is admirably low in use of force incidents.

Dr. Schwartz cites statistics from two institutions, Shelby County Jail and Milwaukee County Jail, which reflect the number of reported use of force incidents in 2011 and 2012. (Exh. C, p. 234-36; Exh. A, p. 17-18). Based on these numbers and the respective jail populations, he calculates the number of use of force incidents per inmate per year at both institutions. (Exh. A,

---

[5] Experts' statistical analyses and comparisons also aid the trier of facts in other types of cases as well. (See, e.g., *Huey v. United States Parcel Service, Inc.*, 165 F.3d 1084, 1086 (7th Cir. 1999) ("(e)xperts in discrimination cases often do statistical analysis to determine whether race (or some other protected characteristic) is an explanatory variable…"); *Driver v. AppleIllinois*, LLC, 2011 WL 4007337 *7 (N.D.Ill.), ("(a) statistically valid survey of the practices of the restaurant industry, or its casual dining segment, if it had been undertaken, might have been admissible to demonstrate what is 'customary.'"); *Victory Records, Inc. v. Virgin Records America, Inc.*, 2011 WL 382743 *1 (N.D.Ill.), (describing the acceptable expert "yardstick" methodology for measuring future lost profits by a comparison with the profits of other similar businesses).

14

p. 17-18).  Dr. Schwartz then concludes that "both facilities appear to be operating at a fraction of the rates of use of force prevalent in Cook County."  (Exh. A, p. 17-18).

At his deposition, however, Dr. Schwartz conceded that he did not locate comparable information for just maximum facility inmates, but rather, drew from data on the overall jail populations at the Shelby and Milwaukee Jails, including minimum, medium and maximum facility inmates in the aggregate.  (Exh. C, p. 241-43).  While acknowledging that use of force incidents are higher in maximum security facilities, like Divisions IX and X, Dr. Schwartz did not find comparable statistics because he "did not have time to go in and do some of the analyses (he) would have liked to do."  (Exh. C, p. 243-44).  Nonetheless, he believed that comparing the use of force rates at entire jail compounds, including divisions that hold minor crime detainees, like DUI offenders, was a "fair comparison" to maximum security facilities like Divisions IX and X.  (Exh. C, p. 245-47).

Surprisingly though, despite calculating the use of force rates at the Shelby and Milwaukee Jails, Dr. Schwartz did not calculate the use of force rate for Cook County Jail (or for just Divisions IX and X) allegedly because of time constraints and burden.  (*Id.*, p. 247-249, 268; Exh. A, p. 18).  To make an "apples to apples" comparison of overall use of force rates, Dr. Schwartz had the statistical data in the materials he allegedly reviewed to make such a comparison, but apparently did not know it.  (Exh. C, p. 259-62).  When Dr. Schwartz was shown the data on the number of use of force incidents at Cook County Jail in 2012 (mentioned in his own report on pg. 40) and the total jail population in 2012 (included in one of the McCampbell monitoring reports that he purportedly reviewed), he agreed with the calculations that demonstrate that Cook County Jail had *half the use of force rate that Shelby County had in*

15

*2012*.  (Exh. C, p. 259-62).  This is the same Shelby County Jail that Dr. Schwartz considers one of the best jails in the United States.  (Exh. E, Declaration, p. 3-4).

When presented with this statistical dilemma in conflict with his opinion, Dr. Schwartz tried to back track and claim he was taking into account all the alleged unreported use of force incidents at Cook County.  (Exh. C, p. 262-63).  When asked whether he had data to determine the unreported use of force incidents, he stated, "that's an impossible figure to calculate because it's—it has to be arrived at inferentially."  (Exh. C, p. 263).  When asked why he then introduced a "comparison" of reported use of force incidents at Shelby County, he had no intelligible answer, other than to wildly speculate that "unreported uses of force in Shelby County would be quite infrequent to rare." (Exh. C, p. 263-66).  Dr. Schwartz felt comfortable throwing out this pure conjecture despite not having "personal familiarity of the (Shelby) jail after 2005."  (*Id.*, p. 266).  In any event, Dr. Schwartz then testified that unreported uses of force, at both the Cook and Shelby jails, are "almost impossible to quantify to any reasonable degree."  (Exh. C, p. 267).

In full circle, this would necessarily mean that Dr. Schwartz's opinion that the Shelby and Milwaukee County Jails are "operating at a fraction of the rates of use of force prevalent in Cook County" rests on nothing.  "'Expert intuition' is neither normal among social scientists nor testable—and the conclusions that are falsifiable aren't worth much to either science or the judiciary." *Zenith Electronics v. WH-TV Broadcasting*, 395 F.3d 416, 419 (7th Cir. 2005).  In the end, this Court is left with no reliable or even reasonable standards from Dr. Schwartz upon which to judge the frequency of violence in Cook County Jail's maximum security divisions.

The opinion of an expert "has a significance proportioned to the sources that sustain it." *Huey v. United States Parcel Service, Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999).  It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the

conclusion the expert's testimony is intended to support. *U.S. v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). Dr. Schwartz does not provide such a link for his blanket conclusions on the rate of violence in Divisions IX and X and essentially "supplies nothing but a bottom line," which in turn, "supplies nothing of value to the judicial process." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989).

## V.   Other Opinions Demonstrate Dr. Schwartz's Improper Methodology

Aside from his principal conclusions on the purported widespread pattern of violence, other conclusory opinions of Dr. Schwartz demonstrate his overall improper expert methodology, and reflect his approach to provide "nothing but a bottom line." For example, Dr. Schwartz opines that "OPR investigations are simply exercises exonerating staff at any cost and in any manner possible." (Exh. A, p. 43). Despite this audacious conclusion, Dr. Schwartz did not know how many OPR investigations resulted in sustained findings out of the files he reviewed. (Exh. C, p. 331-32). Dr. Schwartz further concluded that "(u)nless there is blatant and irrefutable video evidence of excessive force by staff, there will be no staff discipline and no other staff accountability." (Exh. A, p. 38). When asked about the basis for that blanket conclusion, Dr. Schwartz had no idea how many OPR investigations resulted in sustained findings without video evidence from the files he reviewed. (Exh. C, p. 332-334). According to Dr. Schwartz, the question isn't even "relevant." (Exh. C, p. 334).

As Dr. Schwartz never determined how many of the OPR investigations were sustained, he also never calculated the percentage of sustained findings out of the OPR files he reviewed. (Exh. C, p. 336). In turn, just like for his opinions on use of force and inmate incidents, and despite all of his claimed work with correctional facilities across the nation, Dr. Schwartz did not provide any statistical comparisons with other institutions regarding sustained excessive force investigations. (Exh. C, p. 336-37).

Dr. Schwartz's methodology also left no room for "adequately accounting for obvious alternate explanations." F.R.E. 702, Advisory Committee Notes. For example, in reviewing video, Dr. Schwartz admitted to selectively seeking out only instances favorable to plaintiffs' case.

> Q: Were you only looking for videos that showed officers not acting in compliance, in your opinion?
>
> A: I was looking for videos that were significant with regard to use of force, failure to protect, lack of professionalism. There were a variety. But was I looking for significant incidents, yes. I mean, I – in the same way that I think an editor to a morning paper doesn't want a headline that says, no accidents on Freeway 12 again. That – that's not very helpful to anybody…

(Exh. C, p. 183-84).

Dr. Schwartz's newspaper analogy demonstrates his misguided idea of appropriate expert methodology. Unlike a newspaper editor's objectives, an expert review is not intended to be an exercise in finding material for sensational or attention-grabbing headlines. Contrary to Dr. Schwartz's belief, objectively reviewing all the evidence to determine whether there is a widespread pattern as alleged, identifying instances where officers complied with policy, and accounting for alternative explanations may not be "helpful" to plaintiffs, but it is certainly necessary to arrive at reliable expert conclusions, and is required under *Daubert*.

Dr. Schwartz's method of selectively searching for information helpful to the plaintiffs' case sheds light on why he had already made up his mind back in February 2014, before he had reviewed hardly any evidence in this case. Indeed, in February 2014, Dr. Schwartz had already concluded that "Cook County Jails are among the worst in this country with regard to violence," that "officer brutality at Cook County Jail is widespread," that "officers just stand by and watch" inmate-on inmate violence, and that "Cook County Jail is in terrible shape and ripe for reform." (Exh. C, p. 33-35; Exh. E).

Dr. Schwartz conceded that he based those grandiose conclusions upon his review of unsubstantiated inmate declarations, and before he had seen any supporting documentation, such as additional documentation produced by defendants, or medical records, or officers' accounts of alleged incidents. (Exh. C, p. 33-35, 37). Indeed, he went on record condemning the jail's operations before reviewing any of the 20,000 pages of documents and hundreds of hours of video produced by the defendants, the thousands of pages of subpoenaed medical records, the depositions of high-ranking jail officials, or touring or interviewing anyone associated with the Jail. As long ago as February, Dr. Schwartz indiscriminately accepted the unsupported statements of inmates as fact, despite his concession that inmates lie more frequently that other people, despite his recognition that it is conceivable that the inmate declarants may have had monetary gain motives, and despite his acknowledgment that he had no knowledge of the process of how the inmate declarations were obtained. (Exh. C, pp. 36, 47-49, 52-53, 56-57, 66-67). Even now, despite possessing actual documentation, Dr. Schwartz has selectively and unreliably attempted to justify his prior speculation. The Court need not be burdened with his testimony and it should be barred.

Rule 702 expressly requires a methodology of valid principles and methods and a reliable application of those principles and methods to the facts of the case. Dr. Schwartz's approach of taking unsubstantiated inmate allegations at face value to immediately form blanket conclusions without adequate investigation, then allowing the attorneys to feed him any information to support opinions already decided, is not a sound or reliable expert methodology.

## VI.   Conclusion

For the foregoing reasons, Defendants respectfully request that this Court enter an order excluding Dr. Jeffrey Schwartz as an expert witness, pursuant to Rule 702 and *Daubert*.

130893411v1 0958932

By: */s/ James M. Lydon*
One of the attorneys for Defendants

Robert T. Shannon
James M. Lydon
HINSHAW & CULBERTSON LLP
222 North LaSalle Street, Suite 300
Chicago, Illinois
Tel. 312-704-3000
Firm No.: 90384

130893411v1 0958932