IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| TYLON HUDSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | 13 C 8752 |
| | ) | |
| TONI PRECKWINKLE, et al., | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Tylon Hudson and four other individuals who were or are housed in Divisions IX and X of the Cook County Jail (the "Jail") seek to represent a class of all current and future detainees in Divisions IX and X in arguing that the risk of violence and the conditions of confinement in those divisions violate the Constitution. Plaintiffs moved the Court to enter a preliminary injunction to put a stop to the alleged "deliberate indifference" of Cook County officials to the alleged "sadistic" behavior of guards and detainees. This case is the latest in a long string of court cases seeking to improve conditions at the Jail dating back to at least 1974. In response, Cook County Board President Toni Preckwinkle and Cook County have filed a motion to dismiss arguing that they cannot be held liable for the actions of those who have direct responsibility for operating the Jail. Named in their official capacities, Cook County Sheriff Tom Dart, Executive Director of the Cook County Department of Corrections Cara Smith, Superintendent of Division X E. Greer, Superintendent of Division IX V. Thomas, as well as Officer Campbell, Sergeant Lewis, Officer Wilson, and Lieutenant Johnson, who were named individually, (the "Sheriff's Office Defendants") have separately moved to dismiss the Amended

Complaint arguing that the injunctive relief sought already exists in the form of an agreed order in *United States v. Cook County* (10 C 2946) (the "Federal Agreed Order") and that the Amended Complaint fails to state a claim for damages.

For the reasons stated below, President Preckwinkle and Cook County's motion to dismiss (Dkt. No. 81) is denied. The Sheriff's Office Defendants' motion to dismiss (Dkt. No. 144) is granted in part and denied in part. The Amended Complaint is dismissed as to Lieutenant Lewis, but the remainder of the motion is denied. Also pending is Defendants' motion to strike Plaintiffs' submission related to the preliminary injunction hearing. (Dkt. No. 231). That motion is denied. Finally, Plaintiffs' motion for a preliminary injunction (Dkt. No. 36) is denied.

## BACKGROUND

### I.     The Cook County Jail

The Jail is one of the largest, if not the largest, single-site county detention facilities in the United States. Roughly 100,000 people are admitted to the Jail each year and the average total daily population is about 9,000. The oldest parts of the Jail date back to 1929. Division IX is a maximum security division designed to house roughly 1,000 male detainees. Division X is a maximum security division designed to hold roughly 800 male detainees. The Cook County Department of Corrections, a division of the Cook County Sheriff's Office, operates the Jail. The Cook County Board provides funding for the Jail.

### II.     Cook County Jail Conditions Litigation

The present case is the latest in a string of civil cases seeking to redress alleged unconstitutional conditions of confinement at the Cook County Jail. The saga began in 1974 with *Duran v. Elrod*, 74 C 2949. *Duran* was a class action that dealt specifically with overcrowding

and insufficient staffing at the Jail. (Dkt. No. 144 Ex. A)[1]. The class in *Duran* represented "all pre-trial detainees at Cook County Jail." The *Duran* class was represented by Robert Lehrer of the Law Offices of Robert E. Lehrer and Locke Bowman of the MacArthur Justice Center at Northwestern University. The case resulted in the "Duran Consent Decree," an agreement between the Sheriff, the County Board President, and the pretrial detainee class that required the jail be monitored by an outside third party which party would report regularly to a district court judge regarding efforts made on the part of the Defendants to correct the overcrowding situation. The Duran Consent Decree was handled by a number of federal judges, the last of which was this Court.

The next civil case seeking to improve conditions at the Jail was *Harrington v. DeVito*, 74 C 3290. The class in *Harrington* represented all pre-trial detainees at the Jail who were in need of mental health treatment. (*Id.*). The class claimed that the failure to provide adequate mental health services at the Jail constituted a Fourteenth Amendment violation. The *Harrington* case also resulted in an agreed order requiring the parties responsible for operating the Jail to follow mental illness screening and classification procedures and provide treatment to eligible detainees. The *Harrington* agreed order also required adequate security staffing for mental health treatment units.

While both Decrees were still operational and in effect, in 2008, the Department of Justice investigated the Jail and found that despite the *Duran* consent decree and *Harrington* agreed order, violence and overcrowding were still pervasive. (Am. Compl. ¶¶ 5-7). In May 2010, the Department of Justice brought suit against Cook County as well as the defendants

---

[1] Exhibit A to Dkt. No. 144 is the notice provided by plaintiffs' counsel in *Duran* and *Harrington* to members of the classes in those cases regarding the proposed voluntarily dismissal of those cases.

named in *Duran* and *Harrington* under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997a. Captioned *United States v. Cook County*, 10 C 2946, the injunctive relief sought by the DOJ was significantly more expansive and fully encompassed the relief sought in both previous agreed orders and sought relief for a number of other alleged violations including violations regarding excessive force and training of correctional officers. For the first time, the new proposed relief sought to bring in experts in the field to monitor and improve the conditions at the Jail. These experts would be divided into four categories – facilities, operations, medical and mental health – and would have an over-arching monitor who would coordinate the experts' work.[2] In the words of the *Duran* and *Harrington* classes, the Federal Agreed Order in *United States v. Cook County* was "more comprehensive than the *Duran* consent decree and the *Harrington* agreed order." (Dkt. No. 144 Ex. A p. 2). The new order, which this Court will refer to as the Federal Agreed Order, was assigned to this Court and resulted in quarterly in-chambers meetings and semi-annual reports by all of the expert monitors to the Court. These meetings addressed whatever needs were addressed by each expert report, whether it be pest control or correctional officer training, and included all of the parties and any other stakeholder within the facility who could add a solution to any of the problems addressed by the monitors. These meetings are intense and ongoing and the Federal Agreed Order and the regular reports and meetings are in effect today.

Specifically, the Federal Agreed Order identifies and regulates the Jail in eight areas: use of force; protection from harm; medical care; mental health care; sanitation; training; quality assurance/performance improvement; fire and life safety; and improved policies, procedures, and

---

[2] There are four independent monitors involved in the *Cook County* case: Dr. Esmaeil Porsa M.D. MPH is the monitor for medical provisions, Dr. Jeffrey Metzner is the monitor for mental health provisions, Harry Grenawitzke is the monitor for the physical plant and capital planning provisions, and Susan McCampbell is the monitor for the corrections provisions.

practices. The protection from harm section is further subdivided into use of force by staff, safety and supervision, security staffing, incidents and referrals, investigations, inmate disciplinary procedures, classification, inmate grievance procedure, access to information, and training and supervision. The Federal Agreed Order provided that it would remain in effect until Defendants maintained a rating of "Substantial Compliance" in each area, as determined by court appointed monitors and approved by the Court, for eighteen months.

The Federal Agreed Order was entered into on May 26, 2010 and monitors reports have occurred 37 times since it was entered into, each series of reports is followed by a meeting with this Court to address any areas of concern – especially those which the reports show as either out of compliance or in need of improvement. The overarching monitor on the Federal Agreed Order is Susan McCampbell, an expert in the field of corrections and criminal justice system leadership with over forty years of experience in the field. The first report submitted by Monitor McCampbell on September 24, 2010 showed a total of 74 of 77 provisions in partial or non-compliance and only three provisions in substantial compliance. As of November 4, 2014, defendants were in substantial or sustained compliance with all provisions of the Federal Agreed Order related to protection from harm. (10 C 2946 Dkt. No. 262 p. 2). All of these reports are on the public docket of *United States v. Cook County*.

At the time that the Federal Agreed Order was entered into, the parties on both sides of the *Duran* and *Harrington* cases "agreed that Judge Kendall should vacate the consent decree in *Duran* and the agreed order in *Harrington*, and dismiss both cases." (Dkt. No. 144 Ex. A p. 11). Recognizing that "the 2010 Agreed Order and the 2011 Supplementary Orders had not only secured for the plaintiff classes [in *Duran* and *Harrington*] all the relief that the *Duran* consent decree and the *Harrington* agreed order had afforded them, but also extended to them substantial

additional relief and protection," (*Id.*) the parties relinquished their cases in favor of the new Federal Agreed Order which offered them a comprehensive and monitored form of relief.In truth, never before had the Jail had the scrutiny of this number of experts analyzing in such exacting detail every structure, procedure, and process at the Jail. Moreover, the parties agreed that "the 2010 Agreed Order and 2011 Supplementary Orders reasonably promised to secure the rights of the plaintiff classes under the Fourteenth Amendment to the United States Constitution." (*Id.*).

At the time of the entry of the Federal Agreed Order, members of the *Duran* and *Harrington* classes were given the opportunity to respond and object to the voluntarily dismissal of their cases. Sixty-six class members responded to the notice of proposed voluntary dismissal and sixteen objected. (74 C 2949 Dkt. No. 1137 p. 6). The "theme" of the bulk of the objections was that "existing conditions at the Jail [were] so poor and [gave] rise to and threat ensuch [*sic*] injury to plaintiffs, violating their constitutional rights in the process, that dismissal of lawsuits that were brought precisely to correct poor conditions at the Jail, and to secure plaintiffs' constitutional rights, is unwarranted." (*Id.*). Of course, the dismissal of the previous lawsuits was not to abandon the issue of poor conditions, but rather to expand the expert intervention into the jail and to expand that intervention beyond any intervention previously contemplated. Although the handful of objectors filed their positions, it was clear to the class representatives that the new Federal Agreed Order would give their clients more relief than even their respective lawsuits had sought previously, and therefore, the class representatives advocated to the Court to approve the voluntary dismissal. The dismissal to the class counsel was actually a moot point because the Federal Agreed Order fully encompassed the existing relief and yet was much broader than *Duran* and *Harrington* relief combined.

Ironically, because he was then incarcerated at the Jail, Plaintiff Hudson was a member of the *Duran* class and entitled to respond or object to the dismissal. Hudson did respond; he did not, however, object. (*See* 74 C 2949 Dkt. No. 1137-1 p. 3). Further irony exists in that one of the class counsel in the *Duran* Consent Decree informed this Court on the record that the Federal Agreed Order "fairly promise[d] a substantial improvement in overall Jail conditions." (74 C 2949 Dkt. No. 1137 p. 10). That same attorney now represents the *Hudson* class arguing that the Federal Agreed Order is inadequate. Ultimately, the Court accepted the classes' argument that voluntary dismissal of *Duran* and *Harrington* would comport with Rule 23 of the Federal Rules of Civil Procedure and dismissed the cases in light of the new, more comprehensive relief that would be provided all members with the Federal Agreed Order covering all aspects of the Jail.

III.    The Present Lawsuit

Hudson was a detainee at the Jail. On December 6, 2013, Hudson filed a pro se complaint alleging that correctional officers at the Jail coordinated an attack on him by another inmate and failed to intervene while he was being attacked in the Division X law library. (Dkt. No. 1). The Complaint also included a *Monell* claim. Hudson sought compensatory and punitive monetary damages to redress his injuries as well as attorneys' fees. (*Id.* p. 24). On December 27, 2014, Judge Shadur granted Hudson's application for leave to proceed in forma pauperis and recruited an attorney to represent him. (Dkt. No. 5).

The recruited attorney's tenure was short. On February 27, 2014 Locke Bowman and David Shapiro of the MacArthur Justice Center at Northwestern University filed appearances on behalf of Hudson and the recruited attorney withdrew. The new attorneys filed an Amended Complaint, adding four named plaintiffs and class claims, and immediately issued a press

release.[3] (Dkt. No. 12). The Amended Complaint was filed "on behalf of all people who now or in the future will be housed in Divisions IX and X of the Cook County Jail" (*Id.* ¶ 31). The Amended Complaint sought injunctive relief on behalf of the class in the form of an order preventing "the Defendants, their agents, employees, and all persons under their control from subjecting Plaintiffs and the class they seek to represent from the unlawful policies, practices, and conduct described" in the Amended Complaint. (*Id.* p. 56). The Amended Complaint also sought money damages for Hudson alone. (*Id.* p. 57). The Amended Complaint acknowledges the Federal Agreed Order, but claims that "little has changed in the jail since the DOJ filed suit." (*Id.*¶ 8).

Plaintiffs quickly moved for the entry of a preliminary injunction.[4] (Dkt. No. 36). The Cook County Defendants – Cook County itself and President Preckwinkle – moved to dismiss the Amended Complaint as to them, arguing that Sheriff Dart was solely responsible for any constitutional violations at the Jail. (Dkt. No. 81). Sheriff Dart and the remaining defendants moved to dismiss arguing that the relief sought in the Amended Complaint overlaps with the Federal Agreed Order's injunctive relief and that the Amended Complaint also failed to state a claim for money damages under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 144).

---

[3] *See* Press Release, Roderick and Solange MacArthur Justice Center, Civil Rights Class Action Suit Documents Culture of Brutality and Violence at Cook County Jail (Feb. 27, 2014) (http://www.law.northwestern.edu/legalclinic/macarthur/projects/treatment/documents/CookCountyJailclassactionnewsreleaseFeb272014.pdf)

[4] Plaintiffs also sought class certification. (Dkt. No. 14). The parties stipulated that Plaintiffs had timely moved for class certification and the motion was withdrawn without prejudice. (Dkt. No. 226). Whether the putative class should be certified has not been briefed and is not presently before the Court.

**MOTIONS TO DISMISS**

*I.      Background*

The Amended Complaint contains fifty-six pages of allegations of horrific treatment of detainees in Divisions IX and X of the Jail. The Amended Complaint contains five counts. Counts I, II, and III seek injunctive relief on behalf of the putative class and Counts IV and V seek monetary damages on behalf of Hudson individually. Counts I, II, and III seek injunctive relief against all defendants named in their official capacity, specifically President Preckwinkle, Sheriff Tom Dart, Executive Director of the Cook County Department of Corrections Cara Smith, Superintendent of Division X E. Greer, and Superintendent of Division IX V. Thomas (collectively the "Official Capacity Defendants"). (Am. Compl. ¶¶ 156-65).[5] Count IV seeks money damages from Officer Campbell individually for ordering other detainees to attack Hudson. (*Id*. ¶¶ 166-68). Count V seeks money damages from Lieutenant Johnson, Sergeant Lewis, and Officer Wilson for their failure to protect Hudson from the gang members under Officer Campbell's control. (*Id.* ¶¶ 169-71).

Counts I and II allege pervasive violence at the Jail. According to the Amended Complaint, detainees routinely suffer serious injuries both by jail staff and other inmates. Plaintiffs also allege deficient grievance processes to redress injuries suffered in the Jail. The Amended Complaint alleges that the Official Capacity Defendants are aware of the danger and have adopted a custom of condoning correctional officers' failure to report uses of force to the proper authorities within the Jail, which both constitutes deliberate indifference to a substantial risk of serious harm and exacerbates that risk. Count I alleges that the Official Capacity Defendants acted with deliberate indifference to the serious risk that detainees would suffer

---

[5] The County of Cook is named as a defendant in the case caption, but not any count of the Amended Complaint.

substantial harm at the hands of correctional officers within the Jail. Similarly, Count II alleges that the Official Capacity Defendants acted with deliberate indifference to the serious risk of substantial harm that detainees would suffer substantial harm at the hands of other detainees.

Count III alleges that the conditions in the isolation and segregation units at the Jail constitutes cruel and unusual punishment. The Amended Complaint alleges that holding detainees in solitary confinement "for 23 hours a day causes profound mental anguish and a documented risk of serious harm." (*Id.* ¶ 146).

Counts IV and V are specific to Hudson himself and are described in greater detail below.

## II. Legal Standard

A complaint "must state a claim that is plausible on its face" to survive a Rule 12(b)(6) motion to dismiss. *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads sufficient factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct." *Id.* (quoting *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff must allege that all elements of its claims are satisfied, but must supply more than bare legal conclusions in order to survive a Rule 12(b)(6) motion to dismiss. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010). "[A]llegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012).

## III. Discussion

As an initial matter, the Court treats Counts I, II, and III as suits against the Cook County Board and the Cook County Sheriff's Office because "[a]ctions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker*

*v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Thus, to the extent the suit is filed against Defendants Dart, Smith, Greer, and Thomas, it is really a suit against the office of the Cook County Sheriff, who has statutory responsibility for operating the Jail. *See* 55 ILCS 5-3-15003. To the extent the suit is filed against Defendant Preckwinkle, it is really a suit against the Cook County Board who has statutory responsibility for funding the jail. *See* 55 ILCS 5/3-15015.

A.      Judicial Estoppel

The Sheriff Defendants first argue that Plaintiffs are judicially estopped from arguing that the Federal Agreed Order does not adequately protect Plaintiffs' constitutional rights because the *Duran* and *Harrington* classes argued that *Duran* and *Harrington* should be dismissed because the Federal Agreed Order provided sufficient relief to detainees at the Jail. Judicial estoppel is not lightly tossed around in the legal arena, yet there appears to be some justifiable legal irritation on the part of Defendants here in that both classes of plaintiffs actually *sought* the relief that is currently being given in the form of the Federal Agreed Order, and at least one of the attorneys who stood before the Court seeking to eliminate the earlier orders is now representing the class that says the Federal Agreed Order is ineffective. Defendants can't help but feel whipsawed under the circumstances: one day you are with me; the next you are against me.

"Judicial estoppel is an equitable concept that prevents parties from playing fast and loose with the courts by prevailing twice on opposing theories." *United States v. Hallahan*, 756 F.3d 962, 975 (7th Cir. 2014) (internal quotation marks and citation omitted). Though there is no precise formula for judicial estoppel, there are at least three factors relevant to whether the doctrine should apply: "(1) whether the party's later position was 'clearly inconsistent' with its

earlier position; (2) whether the party against whom estoppel is asserted in a later proceeding has succeeded in persuading the court in an earlier proceedings; and (3) whether the party 'seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.' " *In re Airadigm Comms., Inc.*, 616 F.3d 642, 661 (7th Cir. 2010) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)). The application of judicial estoppel is a matter of discretion. *In re Pansier*, 451 F. App'x 593, 596-97 (7th Cir. 2011).

Unfortunately for the Defendants, the doctrine is not applicable here because it cannot fairly be said that the party against whom estoppel would be asserted is the same party who took the purportedly inconsistent position in prior litigation. The putative class here comprises all individuals housed now or in the future in Divisions IX and X of the Jail. (Am. Compl. ¶ 31). The *Duran* and *Harrington* classes represented individuals housed in the Jail during the pendency of those cases. Neither *Harrington* nor *Duran* purported to represent the interest of future detainees in perpetuity.[6] While there is some overlap among the identity of the classes – Hudson himself, for example, was a member of the *Duran* class – the bulk of the class that Plaintiffs seek to represent were not members of the *Duran* or *Harrington* classes. Though counsel in this case overlaps substantially with counsel in *Duran*, prohibiting the present class from presenting arguments that the present conditions in Divisions IX and X of the Jail are unconstitutional today because some members of the present class were members of the *Duran*

---

[6] The current litigation, however, does. (*See* Am. Compl. p. 56) ("Plaintiffs respectfully pray that this Court . . . enter an order certifying a class of all people who *nor or will be housed* in Divisions IX and X of the Cook County Jail"). The Court struggles to square this fact with Plaintiffs' assertion that "[i]t would be inequitable for a statement made in 2011, on behalf of detainees no longer at the jail, to foreclose any further effort by Cook County Jail detainees to enforce their constitutional rights through injunctive litigation." (Dkt. No. 178 p. 9).

or *Harrington* classes would not serve the interest of justice. The Court will not punish the class members for class counsel's caprice.

### B. Mootness

The Sheriff Defendants next argue that the portions of the Amended Complaint seeking injunctive relief should be dismissed on mootness grounds because the relief sought overlaps with injunctive relief already mandated under the Federal Agreed Order. (Dkt. No. 144 p. 13). A claim for injunctive relief may be moot when there is a "high degree of duplication" between the claim and existing injunctive relief. *See Madyun v. Thompson*, 657 F.2d 868, 872 (7th Cir. 1981). This theory also does not fall entirely flat in that the previous judge who was assigned the matter also was concerned about that overlap. That judge sought to have the cases combined before this Court in order not to duplicate any of the relief that might have been given already in this matter and, of course, not to drain judicial resources. The standard is high, however, requiring nearly an "identity of content" between existing injunctive relief and the subsequent lawsuit. *Id*. Though the potential for substantial overlap in injunctive relief is obviously present here, the case is not moot. It is difficult to know exactly what sort of injunctive relief Plaintiffs are seeking since it evolved over time with each court hearing. Plaintiffs, however, established based on their written submissions that they seek injunctive relief that is not necessarily provided by the Federal Agreed Order. Plaintiffs presented various specific actions that they would like to be taken at the Jail to redress their alleged constitutional injury. Based on the parties' submissions and the representations made at in open court, the Court determined that a hearing on the preliminary injunction was necessary because the relief did not overlap completely with the relief already being provided by the Federal Agreed Order. (Dkt. No. 248).

13

The finding that the case is not moot, of course, does not necessarily suggest that any of the relief sought by Plaintiffs is appropriate in this case. That must be addressed on the merits after review of the evidence presented during the evidentiary hearing on the motion for preliminary injunction. At this point, the Court simply finds that Plaintiffs seek at least some injunctive relief not presently provided by the Federal Agreed Order. The Court addresses the propriety of the injunctive relief below.

C.     PLRA

The Sheriff Defendants argue that the Prison Litigation Reform Act, specifically 18 U.S.C. § 3626, prohibits the Court from granting the relief sought in the Amended Complaint. The PLRA requires that any prospective relief be narrowly drawn, extend no further than necessary to remedy a constitutional violation, and is the least intrusive means necessary to achieve that goal. *See* 18 U.S.C. § 3626(a)(1)(A). Defendants' one paragraph argument on this point is conclusory and underdeveloped to the point of waiver. *See United States v. Wescott*, 576 F3d 347, 356 (7th Cir, 2009) (unsupported and undeveloped arguments are waived). While Defendants may be correct that granting all the relief sought by Plaintiffs would violate the PLRA, this conclusion supports crafting a pointed remedy if prospective relief is shown to be appropriate, not dismissing the case at the pleadings stage. The Court is aware of its obligations for crafting injunctive relief under the PLRA.

D.     Cook County Motion to Dismiss

Cook County and President Preckwinkle move to dismiss the Complaint as to them. They argue that they cannot be held liable for the conduct of the Sheriff's Office at the jail because Sheriff Dart is not an employee of the County and the operation of the jail is committed to his sole responsibility under Illinois law. Preckwinkle and Cook County Board are correct to the

extent that they argue that no vicarious liability exists under § 1983, *see, e.g.*, *O'Shell v. Cline*, 571 F. App'x 487, 491 (7th Cir. 2014), but they are incorrect that that conclusion warrants dismissal in this case. A governmental body can be held directly liable under § 1983 when there is a plausible "allegation that the official policy is responsible for the deprivation of rights." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) (quoting *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 690 (1978)). The Board itself can indeed be held accountable for its own actions under § 1983.

The Amended Complaint states a claim for injunctive relief based on the Board's own conduct in underfunding the jail despite its knowledge of the substantial risk of serious harm that detainees experience at the Jail. As this Court is well aware, a significant number of the issues regarding conditions at the Jail are related to the extremely old facility itself. Simply maintaining the old structure is costly and requires movement of pretrial detainees to other areas of the jail simply to keep the Jail at its most basic level of adequate functioning. Monitor McCampbell has frequently raised the significant impact of the decaying facility on operations and safety. All of the funding for that functioning and that old facility comes from the Cook County Board. The Amended Complaint alleges in Counts I, II, and III that the County policy or practice of providing inadequate funding for the jail were causally related to the harms suffered by inmates. Moreover, the Amended Complaint alleges that the County was well aware of the risk of harm in the Jail and maintained the allegedly inadequate level of funding. These allegations are sufficient to state a claim and survive the motion to dismiss. *See, .e.g.*, *Shoppell v. Schrader*, No. 08 C 284, 2009 WL 1886090 at *6 (N.D. Ind. June 30, 2009) ("critical question is whether Council's funding decisions were made with deliberate indifference to [prisoner's] rights"). Thus, Cook County's motion to dismiss is denied.

The Court also notes the practical reality of the Cook County Board's involvement with the Jail. The Board is responsible for providing adequate funding for the Jail under Illinois law. *See* 55 ILCS 5/3-15015 ("The County Board must appropriate and provide funds for the necessary ordinary and contingent cost incurred by the office of the Sheriff in the performance of its powers, duties and functions" which include operation of a jail). President Preckwinkle's predecessor signed on to the Federal Agreed Order on behalf of the Board. Indeed, the Board recently moved the Court to enter an order transferring responsibility for the execution of the emergency Prisoner Release Order in the Federal Agreed Order from the Sheriff to the Cook County Board. (10 C 2946 Dkt. No. 218). It strains credulity for the Board to distance itself from the Jail when it comes to shielding itself from liability here while at once seeking greater involvement with Jail operations under the Federal Agreed Order.

For those reasons, Preckwinkle and the Cook County Board's motion to dismiss is denied.

### E. Adequacy of Pleading as to Counts IV and V

Defendants Campbell, Johnson, Lewis, and Wilson move to dismiss Counts IV and V for failing to plead sufficient facts that state a plausible claim for money damages. (Dkt. No. 144 p. 15). As stated above, the Court takes the following allegations from the Complaint as true for the purposes of the motions to dismiss. *See Vinson v. Vermillion Cnty. Ill.*, 776 F.3d 924, 925 (7th Cir. 2015). The Amended Complaint alleges that Officer Campbell and Lieutenant Johnson used their positions of authority to recruit other detainees to assault Hudson because Officer Campbell believed that Hudson had murdered a member of Campbell's family. (Am. Compl. ¶¶ 120-31). The other detainees had openly threatened Hudson and prison officials were aware of the threats. (*Id.*). Even though Johnson arranged to move Hudson to protective custody in Division III as a

result of the credible threats, Johnson and Campbell further conspired to move the threatening detainees to Hudson's new tier. (*Id.* ¶ 122). After two weeks in protective custody, then-Sergeant Lewis informed Hudson that he was required to move back to Division X because Division III did not have the ability to treat his epilepsy. (*Id.* ¶ 123).

After returning to Division X, Hudson spent a substantial amount of time in the law library preparing for his criminal case. Officer Wilson was the correctional officer assigned to the law library and was aware of the need to keep Hudson separate from the threatening detainees in the law library. (*Id.* ¶ 125). Eventually, the other detainee and Hudson were in the law library at the same time. Rather than enforcing a directive to keep the two separated, Officer Wilson, the correctional officer assigned to the law library, told Hudson simply to "be careful" when the other detainee was on his way to the law library. (*Id.* ¶ 128). While in the library, the other detainee punched Hudson and slashed him with a shank. (*Id.* ¶ 129).

Prison officials have a duty to protect detainees from violence at the hands of other detainees. *See Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006); *see also Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Correctional officers may not exhibit "deliberate indifference to a substantial risk of serious harm," including harm posed by other inmates. *Farmer*, 511 U.S. at 828. "The deliberate indifference requirement means that the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Olson v. Morgan*, 750 F.3d 708, 713 (7th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837) (internal quotation marks omitted). Once the correctional officer is subjectively aware of the risk, he or she may not simply disregard it. *See Kingsley v. Hendrickson*, 744 F.3d 443, 461 (7th Cir. 2014).

17

The Amended Complaint alleges sufficient facts to state a plausible claim against Officers Wilson and Campbell as well as Sergeant Johnson. The Amended Complaint alleges that Campbell and Johnson conspired to create a substantial risk of harm in the form of a gang attack directed at Hudson. The Amended Complaint further states that Wilson received a directive to keep Hudson apart from the detainees who had been threatening him, plausibly suggesting that Wilson was subjectively aware of the risk of harm that Hudson faced. Moreover, Wilson's own words corroborate her knowledge of the threat against Hudson. Officer Wilson warned Hudson to be careful of the detainee about whom she had received a directive, but did nothing to ensure that the two remained separated in the law library according to the allegations. According to the Amended Complaint, Wilson, Campbell, and Johnson all knew of the specific threat that specific other detainees posed to Hudson and either did nothing to stop the harm or, worse, actually worked to ensure the threats would come to fruition. *See, e.g.*, *Hoban v. Godinez*, 502 F. App'x 574, 578 (7th Cir. 2012) (complaint stated Eighth Amendment claim when prison officials had knowledge of specific threat but refused to take action to protect inmate). At this stage, the allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss.

The Amended Complaint does not allege sufficient facts to support a claim of deliberate indifference against Lewis. The only factual allegation involving then-Sergeant Lewis is that she oversaw Hudson's move from Division III protective custody to Division X. (Am. Compl. ¶ 123). The Amended Complaint contains no allegations that lead to the inference that Lewis knew anything about the threat against Hudson, let alone that she subjectively believed that Hudson was in serious danger and was indifferent to the threat. *See Olson*, 750 F.3d at 713. The Amended Complaint would be insufficient as to Lewis even if Hudson had alleged that he had stated that he felt threatened in Division X because "prison guards are neither required nor

expected to believe everything inmates tell them." *Id.* The Amended Complaint does not plead facts sufficient to find that Lewis had the subjective knowledge required for a deliberate indifference claim. Defendant Lewis is therefore dismissed.

## PRELIMINARY INJUNCTION

Shortly after filing an Amended Complaint, Plaintiffs moved the Court to enter a preliminary injunction "to protect the men housed in Divisions IX and X from the serious injuries that most certainly await them in the absence of court intervention." (Dkt. No. 36 p. 1). The Plaintiffs are not specific about the nature of the relief they request. Instead, they ask the Court to: (1) order Defendants to propose a remedial plan; (2) order Plaintiffs to respond to the proposed remedial plan; and (3) resolve any dispute among the parties as to the appropriate injunctive relief. (Am. Compl. p. 55). Plaintiffs seek injunctive relief only on Counts I and II of the Amended Complaint relating to Jail officials' deliberate indifference to the risk of physical harm at the Jail. Defendants oppose the entry of a preliminary injunction. For the reasons that follow, the Court denies Plaintiffs' motion for a preliminary injunction.

I.      Hearing Testimony

The Court held a nine-day evidentiary hearing over nearly two months on the preliminary injunction motion. During the hearing, the following witnesses testified: (1) Dr. Jeffrey Schwartz, an expert in the field of jail operations and security who testified on behalf of the Plaintiffs; (2) James Ford, a detainee at the Jail, (3) Marcus Simmons, a detainee at the Jail; (4) Quinton Brown, a detainee at the Jail; (5) Curtis Curry, a detainee at the Jail; (6) Matthew Burke, Chief of Staff to the Executive Director of the Cook County Department of Corrections; (7) Margo Frasier, an expert in the field of jail operations who testified on behalf of the Defendants; and (8) Nancy Donahoe, General Counsel to the Cook County Sheriff. The Court also admitted into evidence designated portions of the deposition of Frank Arce, Commander of Operations in

Division IX. Finally, Plaintiffs introduced 120 unsworn statements of detainees regarding conditions in the Jail.

A.    Expert Testimony

1.    Dr. Schwartz

Dr. Jeffrey Schwartz testified on behalf of Plaintiffs as an expert witness[7] in the areas of jail operations and security. (Tr. 160)[8]. Dr. Schwartz has a Ph.D. in Psychology and has worked in the field of corrections for over two decades as a consultant. Dr. Schwartz testified that his methodology involved reviewing documents, policies, procedures, use of force packages or investigations, inmate grievances, disciplinary records, and video. (Tr. 38). Dr. Schwartz also toured the Jail. (Tr. 53). Dr. Schwartz testified for two full days.

It was Dr. Schwartz's professional opinion that the Jail was "among the worst" in in the country with regard to violence. (Tr. 159). He opined that a culture of violence exists at the Jail and that detainees live in constant fear of violence at the hands of guards and detainees alike. In his opinion, there exists a code of silence among correctional officers that the higher-level officers at the Jail supports.

---

[7] The Court denied Defendants *Daubert* motion to the extent it sought to prevent Dr. Schwartz from testifying as an expert in the fields of jail operations and security. The Court took the motion under advisement as to Dr. Schwartz's qualification to testify to various statistical conclusions in his expert report. (Dkt. No. 278). At that time, Plaintiffs represented to the Court that Dr. Schwartz would not testify to his statistical conclusions and he did not, in fact, testify in that area. Therefore, Defendants' oral *Daubert* motion is dismissed as moot to the extent it sought to bar Dr. Schwartz's statistical opinions.

[8] Unless otherwise noted, Transcript references are to the preliminary injunction hearing that took place over eight days before the Court. The pages are numbered continuously across nine Volumes, each corresponding to a single day of testimony. Volume 1 is Dkt. No. 280; Volume 2 is Dkt. No. 281; Volume 3 is Dkt. No. 295; Volume 4 is Dkt. No. 299; Volume 5 is Dkt. No. 304; Volume 6 is Dkt. No. 308; Volume 7 is Dkt. No. 309; Volume 8 is Dkt. No. 314; and Volume 9 is Dkt. No. 315.

In order to reach his conclusion, Dr. Schwartz relied heavily on detainee declarations and statements that were created and gathered by Plaintiffs' counsel, describing them as a major factor in reaching his conclusions as to the prevalence of officer misconduct at the Jail. (Tr. 43, 70). In spite of testifying that detainees lie at a greater rate than the general population, Dr. Schwartz relied heavily on the unsworn statements of the pretrial detainees.

Dr. Schwartz's conclusions were based upon his review of the thousands of pages of documents that he received from the lawyers and law students working with the Northwestern's MacArthur Justice Center who represent the Plaintiff class. Those lawyers and students would review incident reports and statements made by pretrial detainees and would then analyze those reports and statements and would provide that analysis to Dr. Schwartz for his professional review. Dr. Schwartz would supposedly then review the reports and interviews objectively and through his expert eye would reach a conclusion as to whether the incident was a constitutional violation based on his experience. Although this was the procedure he described, what became clear on cross-examination is that the majority of the conclusions he reached were the conclusions set forth by the students and lawyers working for the Plaintiffs. Numerous emails were presented to show that the alleged expert report was nothing more than a regurgitation – often verbatim – of the analysis and opinions of the MacArthur Justice Center lawyers. Dr. Schwartz's opinions and conclusions were "word for word" what the lawyers fed to him. Dr. Schwartz explained this by saying they were the ones who put pen to paper to put his conclusions into words. (Tr. 116-19). He testified that he reviewed what the MacArthur staff provided to him and was confident that it was consistent with the conclusions he would have reached anyway and that it would have been duplicative to rewrite what they had written, though he did use their drafts "word for word." (Tr. 94-95).

Dr. Schwartz did not testify as to the constitutional floor for conduct on the part of Jail officials, although he described the length of investigation at the jail as giving him "a concern" (Tr. 243) and concluded at times that conduct exhibited "a lack of professionalism." (Tr. 114; *see also* Tr. 115, 169, 265). Dr. Schwartz further testified on cross that incompetence of OPR investigators could have accounted for the delay in cases that were delayed. (Tr. 255). Dr. Schwartz also testified that he had a negative opinion of the Jail's policy of allowing detainees to self-select for protective custody. (Tr. 171). On cross, however, Dr. Schwartz testified that this practice was not unacceptable within the field of corrections nationally. He testified that protective custody at the Jail was "unusual." (Tr. 171). Finally, Dr. Schwartz admitted that episodes of excessive force will occur even in the best run jails. (Tr. 301)

The Court assigns little weight to Dr. Schwartz's testimony due to its significant flaws in its methodology and analysis. First, Dr. Schwartz's heavy reliance on detainee declarations and statements that are not subjected to cross examination or even verified by oath reflects his desire to rely on evidence that has not been subjected to scrutiny or validated with risk of prosecution or other detriment to the affiant if it is false., *See, e.g.*, *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir. 2000) (reliance on unsworn, self-serving statements goes to weight of expert testimony); *see also Tate v. Riegert*, 390 F. App'x 550, 552 (7th Cir. 2010) ("unsworn letter was entitled to no weight as substantive evidence) (internal quotation and citation omitted). Second, Dr. Schwartz's reliance on the statements of the MacArthur Justice Center lawyers and students for the conclusions he reached within his expert report erodes the Court's confidence in his conlcusions. An expert is expected to review evidence objectively and to apply his methodology to scrutinize it and conclude based on his expertise. Here, Dr. Schwartz completely abdicated his role as an objective and critical analyst when he accepted without scrutiny the conclusions given

22

to him by Plaintiffs' lawyers. *See, e.g.*, *Obrycka v. City of Chicago*, 792 F. Supp. 2d 1013, 1026 (N.D. Ill. 2011) (court "harbored serious concerns" about expert report influenced by counsel). Third, by failing to look at all sides of the incident, his conclusions fail to take into account all factors and circumstances involving the incidents he purported to analyze. Just as each pretrial detainee was entitled to have the incident reviewed from his perspective, so too were the defendants. An expert trained in jail operations should be comfortable looking at both sides of the incident and reaching a conclusion based on that analysis. *See, e.g.*, *Richman v. Sheahan*, 415 F. Supp. 2d 929, 944 (N.D. Ill. 2006) (expert report relying on one versions of events without having considered other versions would not be helpful to jury). Here, by failing to review the opposing version of events, his conclusions carry less weight. Finally, the Court questions whether Dr. Schwartz was truly aware of the standard to be applied to the matter. His testimony was replete with comments, such as the need to increase "professionalism" or that behavior was not "appropriate." The Court needs to determine whether there are ongoing constitutional violations, not whether Defendants are acting politely or professionally. The nature of Dr. Schwartz's criticisms was sufficiently vague as to be unhelpful to the Court's determination. *See Davis v. Duran*, 276 F.R.D. 227, 236 (N.D. Ill. 2011) (vagueness of expert testimony negatively affects its weight); *see also Cage v. City of Chicago*, 979 F. Supp. 2d 787, 827 (N.D. Ill. 2013) (expert's bias goes to weight of testimony).

### 2. Margo Frasier

Margo Frasier testified as an expert on behalf of Defendants. Frasier has a law degree from Florida State University and an undergraduate degree from Sam Houston State University in criminology and corrections. (Tr. 768). She worked as a correctional officer while she was in college in Huntsville, Texas. (Tr. 768-69). Frasier also worked at the Travis County, Texas

Sheriff's Department and wrote the use of force policy for the Travis County Jail. Frasier has led training on use of force in jail settings and jail management. In reaching her conclusions, Frasier reviewed in depth documents from two incidents involving the use of force. (Tr. 853). Frasier testified as an expert in the fields of jail operations and security. (Tr. 664).

Frasier concluded in her expert opinion that detainees in Divisions IX and X of the jail do not live under a constant risk of life threatening violence. (Tr. 891). In reaching her conclusion, Frasier relied on use of force review documents, OPR documents, monitors' reports from *United States v. Cook County*, and detainee interviews. Frasier looked at the detainee declarations provided by Plaintiffs, reviewed them skeptically, and analyzed them as only one version of the offense while looking to all other facts provided to her. (Tr. 850) Frasier also toured the Jail. Frasier testified that there were fights between detainees at the Jail, something not uncommon in a jail setting, but that the violence was not pervasive. She also testified that correctional officers used force – sometimes inappropriately – at the Jail, but that it was not a situation where detainees live in fear of violence at the hands of the guards.

Frasier testified that Officer Gonzalez, who was shown on video in an altercation with Brian Gracia, should face discipline for his actions. (Tr. 909). The video shown to the Court of this incident depicted a clear and egregious example of excessive force committed by a correctional officer against a detainee. The video depicts Garcia on a telephone in what appears to be an empty day room and a correctional officer approaching him and without warning punching his face and dragging him away in a headlock. There is no dispute that the behavior is abhorrent. Frazier testified that the correctional officer should be disciplined for the incident. (Tr. 909).

Frasier reviewed the existing use of force policy at the Jail and found it to be adequate. (Tr. 918). She reached this conclusion by reviewing the policy itself and speaking with employees at the Jail and Sheriff's Department. Frasier testified that the detainees with whom she and Dr. Schwartz spoke were familiar with the grievance process and were aware that they could contact the Department of Justice if they had concerns about the use of force at the Jail. (Tr. 828). Although Frasier testified that vague language in use of force reporting by guards is disfavored because it hampers the use of force review process, she commended the Jail for the implementation of a use of force review system as a check and balance on the use of force. Frasier testified that vague language in use of force reporting by guards is disfavored because it hampers the use of force review process.

        B.        Detainee Testimony

        1.        James Ford

James Ford is a nineteen year-old former detainee at the Jail. Ford was housed at the Jail while his criminal charge of armed robbery was pending. At the time of the hearing, Ford had not been housed at the Jail for five months because he had transitioned into IDOC custody. Ford testified about two incidents of excessive force that he personally experienced. First, he testified that correctional officers hit him in the face and turned the camera away from the beating. (Tr. 424). Second, Ford testified that on March 20, 2014, he received another beating following a verbal altercation with Officer Couch. (Tr. 436-42). Ford claimed that Couch pushed him to the ground, knocked his legal papers out of his hands, put him in a headlock, and punched him. (Tr. 453). OPR was still investigating the incidents as a potential wrongful use of force at the time of the hearing. (Dkt. No. 317 p. 12; Dkt. No. 318 p. 17). There was no testimony that

Defendants blocked his access to the grievance procedure, failed to investigate the claims, or failed to discipline officers if those officers were deemed to have violated his rights.

Ford testified that he believed detainee on detainee violence occurred at the Jail, but that he had never observed it. (Tr. 514). Ford testified that he occupied a corner cell in Division 9 and had a poor view of what went on outside his cell. (*Id.*). Ford testified that he is a member of the Vice Lords. On cross-examination, Defendants introduced a recorded phone call of Ford discussing plans to attack a correctional officer if he were given the opportunity, demonstrating his bias. Ford also testified that he faked a suicide attempt in order to manipulate his housing assignment. (Tr. 529-30).

2. Markus Simmons

Video showed Markus Simmons being escorted into an elevator by multiple correctional officers after a gang fight in one of the Jail's dayrooms. The officer holding the camera does not enter the elevator. Dr. Schwartz testified that the term "elevator ride" is a term used in the Jail to describe a beating by correctional officers on elevators where there are no cameras. (Tr. 248-49). No other photographic or medical evidence documented any physical harm after the elevator ride depicted on video. Following the elevator ride, Simmons gave a taped statement to correctional officers in which he denied being subjected to excessive force and even denied that a fight between the gangs had occurred in the dayroom. (Tr. 573). Video of that statement confirmed that Simmons did not suffer any sever facial injuries. Although Simmons did not file a grievance following the elevator ride, he testified in Court that two officers punched him on the elevator. (Tr. 546). Simmons further testified that he had never filed a grievance related to correctional officer conduct or violence during his time at the Jail. (Tr. 559).

Simmons also testified regarding the fight that preceded the alleged "elevator ride." (Tr. 562). He testified that fifteen to seventeen members of the Gangster Disciples and Vice Lords were fighting in the day room while a handful of correctional officers watched from the protected "bubble." (Tr. 561).

The Court was able to view this incident on video. Simmons's account of the event exaggerated both the duration of time before correctional officers entered the day room and the force used against him. While he claimed to be thrown to the ground by officers, the video showed Simmons already to be on his knees and getting on the ground when officers placed him in handcuffs. Simmons testified that he had lied to investigators about the incident. (Tr. 573-74). Simmons lied to correctional officers about his gang affiliation in order to manipulate his housing assignment at the Jail. Simmons is a Gangster Disciple. (Tr. 561).

### 3.     Quinton Brown

Quinton Brown testified that he requested a transfer away from detainees who had threatened him and that the request was denied. (Tr. 594-99). Brown did not receive a response to his request. (Tr. 595). A month later, Brown testified that two detainees attacked him while officers looked on and took no action to protect him. (Tr. 595-96). He requested to be moved again while he was at Cermak being treated. (Tr. 597). The next day Brown returned from Cermak and again was attacked by the same detainees. (Tr. 597-98). Brown did not press charges against the detainees who attacked him and declined the Jail's offer to be transferred to protective custody. (Tr. 601). Although Brown testified that these incidents occurred, he never filed a grievance with the Defendants to apprise them of the alleged beatings.

Brown also testified that he had never been a victim of violence at the hands of officers at the Jail, though he has been housed at the Jail on five separate occasions. (Tr. 616). He testified that he has filed one grievance at the Jail – a complaint having to do with his laundry. (*Id.*).

### 4. Curtis Curry

Curry testified that he has been in and out of the Jail for the past thirty years. During those thirty years, he testified that he was the victim of violence in the Jail one time. In that incident, a correctional officer slapped Curry's face which resulted in a perforated eardrum. (Tr. 636). Curry filed a grievance after the incident. (Tr. 637). Curry testified that he received a response to his grievance about a week after the incident and was interviewed around six months later. (Tr. 638-39). OPR investigated within five days of receiving Curry's grievance. (Tr. 688-89). Curry and the officer who allegedly hit him have not been alone together since the date of the incident. (Tr. 690). The investigation remains open. Curry testified that he intended to file a civil lawsuit regarding that incident of violence and he hoped to purchase an Escalade with the proceeds. (Tr. 706).

### C. Detainee Declarations

Plaintiffs have presented a number of unsworn and unauthenticated letters describing the conditions at the jail and their experiences there. (Pl. Ex. 124). This Court may grant a preliminary injunction based on less formal procedures and less extensive evidence than a trial on the merits, *see Goodman v. Ill. Dept. Of Financial and Professional Regulation*, 430 F.3d 432, 439 (7th Cir. 2005) (the court may rely on hearsay affidavits), yet the Court finds little reason to afford any significant weight to these unsworn and unauthenticated statements for a number of reasons. *See, e.g., Ill. League of Advocates for Developmentally, Disabled, et al. v. Quinn*, No. 13 C 1300, 2013 WL 6355552, at *4 (N.D.Ill. Dec. 5 2013) (admitting, but providing

less weight to unsworn letters than to stipulated facts and sworn testimony at preliminary injunction hearing); *D.U. v. Rhodes*, 2015 WL 224932, at *4 (E.D. Wis. 2015) (unsworn statements and unauthenticated documents insufficient to grant preliminary injunction). First, the majority, if not all, the statements in this case were compiled *en masse* by MacArthur Center staff and volunteers visiting the jail to interview inmates and were neither sworn to, nor made under penalty of perjury. *See, e.g., London v. Guzman*, 26 F. Supp, 3d 746, 753 (N.D. Ill. 2014) (distinguishing between unsworn declaration dated and signed "under penalty of perjury" and unsigned affidavit not made under penalty of perjury); 28 U.S.C. § 1746 (same). There is no explanation in the record for why Plaintiffs' counsel would go through the trouble of obtaining the statements without the added step of having them sworn as being the truth. There are numerous reasons why a pretrial detainee might not swear to a statement including, but not limited to, his potential risk of being prosecuted for perjury if a statement is deemed to be a false statement presented to the Court. The benefit of a sworn statement is that the Court recognizes that the affiant is putting himself at risk in stating the facts that are contained within the statement. This Court will not guess at the Plaintiffs' reasoning for gathering this type of statement where they could have acquired sworn or authenticated statements made under penalty of perjury.

This Court and the magistrate judge who worked diligently for months on the discovery management of this matter afforded Plaintiffs ample opportunity to obtain statements with greater indicia of reliability and they failed to do so. Plaintiffs' counsel repeatedly sought to have the preliminary injunction hearing held and repeatedly objected to any delay in presenting their evidence. Defendants, on the other hand, sought discovery extensions to respond to Plaintiffs' allegations. Not once did Plaintiffs' counsel seek a delay to obtain the statements under oath

recognizing what little weight a biased and unsworn statement can have in a trial of facts. Even during the hearing, the Court offered the Plaintiffs an opportunity to obtain a portion of the affidavits under oath and it was not until after the close of evidence that they sought to take the Court up on its offer to strengthen their evidence. That request was too late. Because these statements lack any indicia of reliability, this Court grants them very little weight in its analysis. *See, e.g.*, *Eyler v. Babcox*, 582 F. Supp. 981, 986 (N.D. Ill. 1983) (unsworn representations cast considerable doubt upon plaintiff's probability of success).

### D. Cook County Employee Testimony

#### 1. Matthew Burke

Matthew Burke is the Chief of Staff to the Jail's Executive Director, a position he has held since May 2014. (Tr. 1139). Prior to that he was an attorney at the Sheriff's Office. (Tr. 1169). Burke testified that he was not personally involved in the use of force review process and he does not independently review the work of those who are.

Burke testified to the process that led to the creation and implementation of the Jail's use of force policy. Court appointed Monitor Susan McCampbell from the *United States v. Cook County* case provided input on the policy. (Tr. 752; Tr. 1074). The Department of Justice reviewed the policy and did not object to its implementation. (*Id.*). The policy was implemented in the spring of 2011 and none of the parties who provided input on the policy have sought its modification since then. (Tr. 1078). The policy's implementation involved training for supervisors, administrators, and correctional officers. The Sheriff's Office paid substantial overtime to its employees to ensure that they were all trained quickly. Burke testified that Monitor McCampbell receives weekly reports on the use of force within the jail. She has not had

any criticisms of Divisions IX or X since monitoring began and has documented those reports in her Monitor reports to the Court.

2.    Nancy Donahoe

Nancy Donahoe is General Counsel of the Cook County Sheriff's Office. (Tr. 1380). Danahoe was involved with drafting the use of force policy and worked on a team that addressed, among other things, the backlog of Office of Professional Review ("OPR") investigations. (Tr. 1207). The OPR procedure is described in greater detail below. Donahoe provided Defendants' perspective with respect to the use of force incidents and investigations about which Dr. Schwartz and the detainees testified. In general, Donahoe testified that while she was aware of rank and file officers who violated the Jail's use of force review policy and who were not disciplined for doing so (Tr. 1394), Defendants' response in the vast majority of incidents was satisfactory. Donahoe's testimony is best described in conjunction with her review of various incidents involving the use of force, which are detailed below when relevant to the Court's findings of fact.

3.    Frank Arce

Frank Arce is the Superintendent of Division IX. (7:24-8:1).[9] He also worked in Division X in around 2002. (9:18). Arce was not aware of the internal procedures or purpose of the Use of Force Review Unit. (12:24-14:5). Arce testified that fights occasionally occurred at the Jail and that he was essentially powerless to prevent detainees from fighting, though he could stop fights when they began. (123:8-13). Arce could not testify that kneeing an inmate in the face constituted a per se policy violation because the totality of the circumstances of an incident dictate the proper amount of force to use. (213:12-214:3). Arce testified that there was nothing

---

[9] Citations are to Arce's deposition which is Dkt. No. 227-51.

inherently suspicious about multiple correctional officers who submit identical reports on the same incident (145: 22-146:2), though he would be concerned if two officers sat together and wrote a single report on an incident (148:5-10). Arce testified that the incident involving detainee Robinson and a knee to the face was a close enough call that it justified referring the case to OPR. (218:20-24). In general, Arce testified that his job as superintendent was to refer cases to OPR when they were "questionable." (221:1-16).

II.    *Findings of Fact*

A.    Findings of Fact Related to OPR Referral Policy

There is a "complex regime" in place at the Jail to report and investigate uses of force. (Dkt. No. 317 p. 8). Plaintiffs summarize the regime well:

> Policy requires that an incident be referred to OPR when (1) 'there are documented or known injuries to a subject including but not limited to extensive or serious injuries; injuries involving fractures or head trauma; injuries of a suspicious nature (including black eyes, injuries to the mouth, injuries to the genitals, etc.)' and (2) 'when an inmate's injuries, as a result of a response to a resistance/use of force incident, cannot be treated within Cermak Health Services and requires transfer to an outside hospital.' (Tr. 1414). As set forth in the *Cook County* Agreed Order, each investigation referred to OPR must be timely, thorough, and include all supporting evidence.
>
> Before an incident reaches OPR, policy establishes a review process that must occur each time an officer uses force. The immediate supervisor or the involved officer provides the first level of review. (Tr. 1223-23). According to Ms. Donahoe's testimony, the immediate supervisor is required to respond to the scene of the incident, ensure medical treatment for the detainee, review the paperwork submitted by the involved officer, and conduct interviews of the detainee and detainee witnesses. (*Id.*). The watch commander (generally a lieutenant, and mandated by jail policy to be an officer senior to the immediate supervisor) provides the second tier of review, and is required to make preliminary findings as to whether the officer's actions comply with the use of force policy and refer any potential excessive force cases to OPR. (Tr. 1383-84). The exempt member (either the superintendent or the commander of the division) reviews the

watch commander's finding (Tr. 1242) and is also tasked with referring any excessive force cases to OPR. (Tr. 1383-84). The final level of review is provided by the department head (the executive director of the Cook County Department of Corrections or her designee), who reviews the preliminary findings of the immediate supervisor, watch commander, and exempt member. (Tr. 1243).

(Dkt. No. 317 p. 8-9) (citations to exhibits omitted). Plaintiffs argue, however, that these policies are widely disregarded in the jail. In support of that contention, Plaintiffs presented evidence of numerous use of force incidents and the investigations that followed.

B.      Findings of Fact Related to Use of Force Incidents and Investigations

Plaintiffs highlight twelve incidents in their post-hearing briefing as relevant to the Court's determination. (*See* Dkt. No. 317).

1)      Plaintiffs presented evidence that Officer Jeffrey Ferrell kneed detainee Kevin Robinson in the head while he was handcuffed, restrained, and bent at the waist. (Tr. 1283). The incident was recorded on video. A grievance was filed by the inmate and an OPR investigation followed. After OPR concluded its investigation, it recommended Officer Ferrell for termination. (Tr. 1283). The investigation was delayed because other officers who witnessed the assault issued false reports and lied to OPR during the investigation. (Tr. 1390). Though officers failed to refer the case to OPR in conformity with policy, discipline of those officers was recommended after Robinson himself filed a complaint register and triggered an OPR investigation. (Tr. 1396). Donahoe testified that those responsible for reporting the incident to OPR, including the watch commander, had violated protocol in this incident. (Tr. 1392). At the close of the investigation, these officers were all recommended for discipline. (*Id.*). After the internal investigation was completed and the officers were disciplined, the Sheriff's Office referred the case to the State's

Attorney for possible criminal prosecution against the officer who committed the underlying violation. Robinson did not testify at the hearing.

2)      Plaintiffs presented evidence that detainee Brian Garcia suffered injury at the hands of a correctional officer when he was punched and dragged from a telephone in a dayroom in May 2014. The watch commander on duty at the time of the incident did not refer the case to OPR immediately, though the exempt member did. (Tr. 237-38). Garcia was given 40 days in solitary confinement after the incident based on accusations from the correctional officer involved. Multiple levels of supervisor failed to refer the incident to OPR initially, despite Garcia's visible injuries. (Def. Ex. 388; Tr. 237-38). The investigation remained pending as of the close of discovery in 2014 and the officer was removed from detainee contact until the resolution of the investigation. Defendants represent that the incident remains open because it has been referred to the U.S. Attorney's Office and State's Attorney's office for possible criminal prosecution of the correctional officer. (Tr. 1579). Garcia did not testify at the hearing.

3)      Plaintiffs presented evidence of injuries that Epigmenio Garcia suffered during an altercation with a correctional officer. Garcia suffered contusions on his back and shoulders, bruising on his forehead and right knee, and loss of consciousness. (Tr. 1306). Garcia was treated at Mt. Sinai Hospital for his injuries. (Tr. 1480). His case did not initially reach OPR despite the fact that he was treated at an outside hospital and the incident resulted in a lack of consciousness, both of which require referral to OPR under Jail policy. (Tr. 1418-19). Donahoe testified that this case should have been referred to OPR under Jail policy but was not. Nevertheless, Donahoe testified that in her judgment it did not need to be referred to OPR in practice because members of OPR, including Investigator Ellitch, had reached an internal conclusion as to what happened,

though the procedure did not comply with official policy. No formal investigation was ever conducted. Garcia did not testify at the hearing.

4)      Detainee John Gentry suffered blunt trauma to his face during an altercation in 2012. (Tr. 1424). The supervisory review channel did not initiate an OPR investigation until Gentry himself submitted a complaint register and OPR's investigation began two years after the incident. (Tr. 1426). The incident was one of the many cases involved in the backlog of cases that existed after the implementation of the Federal Agreed Order. (Tr. 1422). The investigation did not include an interview with Officer Norise, the correctional officer accused of assaulting Gentry. OPR concluded that Gentry had initially pushed Norise and that Norise struck Gentry with a closed fist in order to gain compliance. (Tr. 1435). Norise provided a statement in the form of an incident report and a use of force report at the time of the incident. (Tr. 1430-31). Donahoe testified that OPR was able to assess the threat facing Norise by using those statements, though he should have been interviewed according to official policy. (Tr. 1431). No witnesses observed the altercation, though officers and three detainees were interviewed. (Tr. 1436). OPR investigated the matter and concluded that the allegations of excessive force were not sustained. In spite of the internal investigation. Officers on the OPR review chain who did not refer the incident to OPR were not disciplined.

5)      Plaintiffs argue that detainee Yuron Robinson was subjected to a use of force by four to six officers in October 2012. The Court viewed footage of the incident in which officers entered a dayroom to put a stop to an ongoing fight. No officers completed a use of force report following the incident. (Tr. 1407). Robinson eventually filed a complaint register, which prompted an OPR investigation. (Tr. 1401). Detainee witnesses testified during OPR's investigation that they had seen correctional officers punch Robinson. (Tr. 1408). The OPR

investigation did not find any indication of any force used against detainee Robinson. (Tr. 1403). The Court has no basis to find that OPR's assessment was incorrect. Robinson did not testify at the hearing.

6)      Luis Serrano suffered a broken arm during a cell extraction, but no Jail employee referred the incident to OPR. (Tr. 1450). Serrano required treatment at Mt. Sinai Hospital, meaning that his case was required to be referred to OPR. (Tr. 1446). OPR investigated the case only when Serrano filed an excessive force lawsuit. (Tr. 1448). OPR did not find evidence of unreasonable force during the cell extraction. (Tr. 1449-50). Video of the incident exists, but the location of correctional officers in the frame obscures the view of the actual extraction. Serrano's civil case (13 C 5519) was settled before another judge in this District. The Court has no basis to disagree with OPR's assessment. Serrano did not testify at the hearing.

7)      Everette Robinson filed a grievance alleging that Officer Appleberry placed him in a headlock, punched, and kicked him. (Pl. Ex. 65). OPR interviewed Appleberry, but not until over a year after receiving the grievance. Appleberry denied using force and no video existed because the lieutenant on the tier had ordered cameras turned off due to nude detainees in the frame. (Tr. 1454). The lieutenant was not disciplined, but failing to video tape the incident was in violation of Jail policy. Appleberry was eventually found to have failed to report a use of force. Pl. Ex. 65. There is insufficient evidence in the record for the Court to make any finding with respect to this incident. Robinson did not testify at the hearing.

8)      Omar Gunn filed a grievance alleging that correctional officers stood by while inmates fought and allowed him to suffer a stab wound in April 2014. (Tr. 1370-71). The grievance claimed that an officer stated that he was going to give the detainees five minutes to settle their differences before he intervened. (Tr. 285). The grievance did not state how many

officers were in the protective bubble or how many inmates were fighting. Donahoe stated that it would not have been appropriate in this case for officers to use verbal control or other non-physical interventions while waiting for more officers to arrive. OPR did not investigate the incident. There is insufficient evidence in the record for the Court to make any factual findings related to the underlying allegations. Gunn did not testify at the hearing.

9)     Isaac Martinez was stabbed in the back by another detainee. (Pl. Ex. 89). Martinez had previously requested to be moved from the unit but the correctional officer denied the request. OPR is investigating the incident. (Tr. 1354). Martinez did not testify at the hearing.

10)     James Ford was struck by correctional officers on two separate occasions. (Tr. 424; 436-42). At the time of hearing, OPR was still investigating the incident as a potential wrongful use of force. (Dkt. No. 317 p. 11). Regardless of the veracity of Ford's allegations, this Court finds on the record before it that Ford was allowed full access to the grievance procedure and was not denied investigation of his claims. The Court finds no evidence that the Jail failed to discipline the subject officers for a violation of Ford's rights.

11)     Following a gang fight, Markus Simmons was escorted onto an elevator by a number of correctional officers, but the officer holding the camera did not enter the elevator. Video from immediately after the alleged elevator ride showed no signs of physical harm. The Court does not find Simmons credible because of the disparities between his reports to officers immediately following the incident and his testimony in court. Simmons exaggerated both the duration and the severity of the force used against him as evidence by the video of his condition immediately prior to and following the alleged attack. Simmons did not file a grievance following the alleged elevator ride. (Tr. 546). Simmons had never filed a grievance related violence during his time at the Jail. (Tr. 559).

12)     Quinton Brown was attacked twice in March 2014 by other detainees. (Tr. 594-99). Brown received adequate medical treatment for his injuries at Cermak. (Tr. 597). Brown requested to be moved away from his attackers. The Jail offered to move Brown to protective custody, but he declined the offer. (Tr. 601). Brown did not file a grievance or press charges against his attackers. (Tr. 598-99).

III.     *Legal Standard*

A party seeking a preliminary injunction "must establish that he is likely to succeed on the merits," *Adkins v. Nestle Purina PetCare Co.*, 779 F.3d 481 (7th Cir. 2015) (quoting *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)), that he or she "has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). If the party seeking the injunction is able to establish the presence of these "threshold requirements, the district court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). The Court must also consider the public interest, "assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011) (citation omitted). The balance process "involves engaging in . . . [a] sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms needs to favor the plaintiff's position." *Ty, Inc.*, 237 F.3d at 895. "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate

relief.' " *Id.* at 895–96 (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992)).

The Prison Litigation Reform Act circumscribes the Court's authority to enter an injunction in the corrections context. *See Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Any remedial relief granted must be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). An "injunction requiring an affirmative act by the defendant" such as the one Plaintiffs here seeks, must be "cautiously viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (citations omitted).

IV.    *Discussion*

A.    Likelihood of Success on the Merits

A municipal defendant cannot be held liable under § 1983 solely because it employs a tortfeasor, or even a criminal. *Bd. of Cnty. Com'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 403 (1997). Plaintiffs must demonstrate the existence of a substantial risk of serious harm of which the municipality itself aware and to which it was deliberately indifferent. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *see also Canton v. Harris*. 489 U.S. 378, 388 (1989) (to support municipal liability, municipal actions must be taken with deliberate indifference to known or obvious consequences). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work[.]" *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). "[T]he word 'policy' generally implies a course of action consciously chosen from among various alternatives." *Calhoun*, 408 F.3d at 380 (quoting *City of Okla. v. Tuttle*, 471 U.S. 808, 823

(1985)) (alteration in original). Evidence of harm is not evidence of deliberate indifference. *Dale v. Poston*, 548 F.3d 563, 569-70 (7th Cir. 2008). "The deliberate indifference test therefore has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk. A response can be reasonable even if it fails to aver the harm." *Dale*, 584 F.3d at 570; *see also Farmer*, 511 U.S. at 836.

A plaintiff must also demonstrate that the municipality, through deliberate conduct, was the cause of the alleged injury. In deciding whether to impose municipal liability, the Court must decide "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Snyder v. King*, 745 F.3d 242, 247 (7th Cir. 2014) (quoting *City of Canton*, 489 U.S. at 385). "A governmental body's policies must be the *moving* force behind the constitutional violation before [the Court] can impose liability under *Monell*." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2009) (emphasis in original). The Court must proceed with caution when considering municipal liability under § 1983. "[R]igorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Id.* (quoting *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 405 (1997)).

There are therefore two elements for which Plaintiffs must establish a reasonable likelihood of success on the merits. First, plaintiffs must show that there is a substantial risk of serious harm at the Jail. Second, they must show that the municipality itself, that is Sheriff Dart, has been deliberately indifferent to that risk. In support of the first, Plaintiffs have introduced episodic evidence of uses of force at the Jail. For purposes of the preliminary injunction, the Court assumes for the sake of argument that these episodes have established that a substantial

risk of harm exists.[10] The record, however, is devoid of any evidence of a custom of deliberate indifference on the part of the municipal defendants.

Plaintiffs' have failed to demonstrate any likelihood of success on the merits because the record does not contain evidence that shows that Defendants have been deliberately indifferent to the risk of harm at the jail, let alone that that indifference was the "moving force" behind the proliferation of a culture of violence at the Jail. Instead, the testimony and evidence produced at the hearing show that the Defendants in the vast majority of cases that Plaintiff selected as demonstrating the worst practices committed by Defendants were reviewed by the internal procedures established to review violence either at the behest of either inmates or staff and those that were determined to have merit resulted in discipline in some form. Both experts testified that even the best run jails have incidents of violence. The issue for the Court is not whether Defendants have eradicated that violence entirely but whether they respond to it reasonably. It is

---

[10] By no means, however, does the Court mean to imply that the Plaintiffs have necessarily met their burden of establishing the existence of a substantial risk of serious harm; it is simply not necessary for the Court to reach that issue in order to deny the injunction. *See* Fed. R. Civ. P. 52(c); *see also Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 787 (7th Cir. 2011) (findings made at preliminary injunction stage do not bind the district court as the case progresses). The episodic evidence of harm that Plaintiffs presented is fraught with serious deficiencies and suggests a misunderstanding of the realities of jail operations and the constitutional standards that apply to this case. Pl. Ex. 111, for example, is a video that shows a fight between detainees that is taking place in a sealed dayroom. Officers look on from inside the protective "bubble" before eventually entering the room, yelling "get on the ground" and subduing the scene. Plaintiffs characterize the video as an example of correctional officers allowing detainees to fight without intervening. They present no evidence, however, of how many officers were immediately available to subdue the fight, the ratio of officers to detainees that represents a safe operation, or how many detainees were in the cellblock. The Court can see no fewer than twenty-five in the video. Plaintiffs argue that this is an example of correctional officers failing to deescalate the situation. Prison guards are "not required to take the unreasonable risk of attempting to break up a fight between . . . inmates when the circumstances make it clear that such action would put [them] in significant jeopardy." *Guzman*, 495 F.3d at 858; *Peate v. McCann,* 294 F.3d 879, 883 (7th Cir.2002).

unrealistic to expect that no incidents will occur but it is expected that when they do occur they will be handled in a constitutional manner. The evidence presented at hearing demonstrated that Defendants have worked diligently – and with marked success in many areas – at combatting the danger that exists at the Jail.

Plaintiffs argue that Defendants have "failed – and continue to fail – to take reasonable actions to protect the men in their custody" even though they are aware of the threat of violence at the Jail. (Dkt. No. 317 p. 5). Plaintiffs argue that the Defendants' "failure to hold accountable officers who engage in excessive force and/or fail to protect detainees from violence" is the clearest evidence of that failure. (*Id.*). The evidence, however, is inconsistent with the notion that officers are not held accountable. There is a significant disconnect between Plaintiffs' arguments and the facts that were presented in court. Specifically, Plaintiffs introduced testimony and documentary evidence of nine use of force incidents at the Jail and four instances of guards allegedly failing to protect detainees. Four of those incidents, involving Markus Simmons, Epigmenio Garcia, Omar Gunn, and Quinton Brown were not investigated by OPR. In none of those cases did Jail staff members refer the cases. Neither Simmons nor Brown filed a grievance for the violence conduct. Three incidents, involving Kevin Robinson, Brian Garcia, and Everette Robinson resulted in staff discipline after the case was referred to OPR. Allegations in three incidents, involving John Gentry, Yuron Robinson, and Luis Serrano, were found to be unfounded after OPR investigated. Three investigations, involving Ford, Curry, and Martinez remain open. Even if the Court were to assume that Defendants intentionally ignored the four incidents that OPR did not investigate, it still would not constitute a pattern of deliberate indifference sufficient to warrant the entry of a preliminary injunction. *See Robles v. City of Fort Wayne*, 113 F.3d 732, 737 (7th Cir. 1997) (evidence that one in five complaints was sustained

foreclosed argument that city had a custom of investigating complaints so as to exonerate police officers).

Plaintiffs have simply failed to supply evidence to support their claims that the Defendants have engaged in a pattern and custom of failing to investigate cases of excessive force or have investigated them in such a way that officers are intentionally exonerated. On the contrary, Defendants provided evidence that shows they have worked diligently to eliminate violence in the jail and have opened the facility to frequent, regular review from four monitors who report the conditions and the incidents of potential violence directly to the Court. Counsel for the Plaintiffs agreed that he had "no doubt that Mr. Burke and Ms. Donahoe have worked conscientiously and have made improvements in policy, use of force review policy, and OPR policy." (Tr. 1563). Conscientious work is not deliberate indifference.

Plaintiffs introduced through testimony and documentary evidence and cited in their post-hearing briefs thirteen incidents at the Jail and argued that each one evinced the Defendants' failure to react reasonably. Of those incidents, OPR had completed investigations in six of them. Three of those investigations sustained charges against the officers. Officers were then disciplined and, in two cases, the incidents were referred to the Cook County State's Attorney's Office for criminal prosecution. (*E.g* Tr 1361). Half of the completed OPR investigations resulted in discipline. The subsequent discipline in itself "belies the existence" of a practice of failing to discipline officers or investigating in such a way that officers were intentionally exonerated. *See Robles*, 113 F.3d at 737 (7th Cir. 1997). The evidence, instead, demonstrates that Defendants were anything but deliberately indifferent to these incidents.

That OPR had not completed investigations in the other three incidents at the time discovery was exchanged likewise does not evince deliberate indifference on the part of the

Defendants. The fact that the OPR investigations did not conclude in the manner that Plaintiffs believe that they should have does not mean that the Defendants are deliberately indifferent to a substantial risk of harm. The OPR system was completely overhauled in 2010 as part of the Federal Agreed Order, after the monitor identified a significant backlog of investigations. (Tr. 1267). Through the monitor's, Defendants have worked diligently to reduce that backlog. Some of the cases have taken longer to investigate than contemplated in Jail guidelines because of the sheer volume of cases for which OPR was responsible. (Tr. 1270-71). Most importantly, at the time of the hearing in autumn of 2014, OPR was reviewing only 2014 incidents, the entire previous backlog having been cleared through the efforts of Defendants in the Federal Agreed Order.

Some cases have been referred for prosecution and even Plaintiffs' own expert conceded, referring cases to prosecutors adds significantly to the investigatory timeline. Regardless, the facts do not support that there are case delays due to indifference. A new procedure was put into place to ensure that cases move more quickly through the review process and it has taken time to work through the backlog of those cases. While again potentially not the ideal outcome, delayed investigations do not constitute a constitutional violation when the delay was reasonable. *Cf. Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) ("The mere failure of the prison official to choose the best course of action does not amount to a constitutional violation.") (internal quotation and citation omitted). Even to the extent that Jail officials mishandled investigations – and they did in some cases by Ms. Donahoe's own testimony – a finding of deliberate indifference "requires more than a showing of negligent or even grossly negligent behavior." *Id.* Importantly, none of the evidence of mishandled investigations showed any knowledge or

mistake on behalf of any named defendant or even an employee with the discretion to create policy at the Jail.

The affirmative steps that Defendants have taken since the entry of the Federal Agreed Order cannot in any sense be characterized as deliberate indifference. Since the monitoring began under the Federal Agreed Order, Monitor McCampbell has visited the Jail and provided periodic reports on the Jail's compliance with the portions of the Federal Agreed Order related to protection from harm. As of her most recent report in November 2014, the Jail was in compliance with all 77 paragraphs of the Federal Agreed Order related to protection from harm. McCampbell provided a chart documenting the Jail's progress since 2010:

| Report # | Sustained Compliance | Substantial Compliance | Partial Compliance | Non= Compliance | Not Applicable | Total |
|---|---|---|---|---|---|---|
| 1 | | 3 | 62 | 12 | 8 | 77 |
| 2 | | 1 | 63 | 5 | 8 | 77 |
| 3 | | 22 | 55 | 0 | 4 | 77 |
| 4 | | 39 | 34 | 0 | 4 | 77 |
| 5 | | 53 | 20 | 0 | 4 | 77 |
| 6 | 21 | 39 | 17 | 0 | 0 | 77 |
| 7 | 35 | 31 | 11 | 0 | 0 | 77 |
| 8 | 50 | 17 | 10 | 0 | 0 | 77 |
| 9 | 68 | 9 | 0 | 0 | 0 | 77 |

(10 C 2946 Dkt. No. 262 p. 4). Specific to the use of force review process at the Jail, McCampbell stated that "CCDOC has the most robust investigative process regarding uses of force than most likely any large or small jail in the United States, in my opinion and experience. Jails are coming to CCDOC to learn how to investigate and analyze uses of force, and develop strategies to minimize use of force." (*Id.*). Specifically, McCambpell noted that she had confidence in the Jails, employee discipline system, incident reporting system, inmate grievance process, referral process, early warning system, and data analysis. (*Id.* p. 7). In short, Defendants

were able to satisfy an independent monitor, the Department of Justice Civil Rights Division, and a federal judge, all of whom has devoted countless hours ensuring compliance at the Jail. "That is not deliberate indifference; it is almost the opposite. What more should they have done?" *Dale v. Poston*, 548 F.3d 563, 571 (7th Cir. 2008).

These accolades belie Plaintiffs argument that Defendants have "fail[ed] to take reasonable steps to protect detainees." (Dkt. No. 317 p. 6). The Jail is not a pleasant place to live, but "[t]he Constitution does not mandate comfortable prisons." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)) (internal quotation marks omitted). As the Court is well aware, Defendants must work hard to ensure that the various categories within the Federal Agreed Order are addressed, but "[t]he mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Guzman v. Sheahan,* 495 F.3d 852, 857 (7th Cir. 2007). Defendants need not do more to comply with the Constitution.

B.    Lack of Adequate Remedy at Law

Plaintiffs have not shown the inadequacy of legal remedies available to them. The Federal Agreed Order, which overhauled the policies and practices of Cook County Jail in response to a Department of Justice investigation, represents effective relief for the established constitutional violation. *See Newman v. Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982) (plaintiffs in prison overcrowding litigation had adequate legal remedy in existing consent decree). This is not a case where the Federal Agreed Order has grown stale and requires modification to renew its adequacy. On the contrary, the Federal Agreed Order addresses the precise subject matter raised in this lawsuit and which was entered and determined to be

adequate by this Court and has been given the full weight and resources of this Court over recent years and months to ensure its enforcement and the Jail's compliance.

C. Irreparable Harm

Plaintiffs are required to show that they would suffer irreparable harm during the pending lawsuit absent the preliminary injunction. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Though there is some analytical overlap, this element is distinct from the inquiry into whether Plaintiffs have demonstrated that they are likely to succeed on the merits. *See Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 787-88 (7th Cir. 2011). Here, the inquiry is whether the Court has "the ability to correct [the purported harm] if it is created." *Id.* A generalized risk of harm from all inmates and guards without more specific evidentiary support is too speculative to warrant relief. *See Biard v. Hodge*, No. 14-1088 slip op. at 3 (7th Cir. March 27, 2015) (citing *U.S. Army Corps of Eng'rs*, 667 F.3d at 788 (7th Cir. 2011)).

The imprecise nature of the relief requested muddies the analysis of this prong substantially. Here, Plaintiffs do not seek a specific order remedying some deficient practice at the Jail. Instead, Plaintiffs essentially seek a seat at the bargaining table to craft a new consent decree or rework the existing Federal Agreed Order. (Am. Compl. p. 55; Tr. 1564). Because it is not clear what the negotiated relief would look like, the Court has no basis to find that a clear showing has been made that there will be immediate, irreparable harm if such negotiation is not ordered. Plaintiffs have not pointed to specific remedies that they feel will protect them from harm. To the contrary, Plaintiffs cite non-compliance with existing injunctive relief and official policy as the source of their purported constitutional injuries. (Tr. 1564). The Court agrees that compliance with the Federal Agreed Order is necessary and works diligently with the monitors in

47

the *United States v. Cook County* case to enforce that compliance, but the Court cannot find on the record presently before it that irreparable harm will result without another order of Court to comply with an existing order. The Federal Agreed Order remains in effect and will protect Plaintiffs against irreparable harm in the immediate future.

D.      Balancing of Harms

Because the Court finds that the Plaintiffs have not demonstrated the presence of the threshold elements required for the entry of a preliminary injunction, the Court need not reach the balance of the harms. *See Ezell*, 651 F.3d at 694 (district court weighs balance of harms "[i]f the moving party meets . . . threshold requirements"). Even so, the Court finds that the balance of harms would not warrant the entry of a preliminary injunction even if the threshold requirements were met.

The public and Defendants have a strong interest in the continued monitoring of the Jail by the four expert monitors in place in *United States v. Cook County* under the Federal Agreed Order without interference by individual detainees.[11] The Federal Agreed Order was the product of extensive negotiations between the Department of Justice, Cook County officials, and the parties to the *Duran* and *Harrington* litigation. A benefit of the relief, as the plaintiffs in *Duran* and *Harrington* recognized, was that a single set of comprehensive standards would govern operations at the Jail. The entry of an injunction in this case would undermine that goal. While

---

[11] The Court does not hold that *all* injunctive relief is foreclosed by the existence of the Federal Agreed Order. Neither CRIPA itself nor the Federal Agreed Order intended to prevent detainees from bringing individual suits when injunctive relief was in place separately. *E.g. United States v. Oregon*, 839 F.2d 635, 636-37 (9th Cir. 1998) ("Both the language and the history of [CRIPA] show that Congress did not intend by its enactment to restrict in any way the authority of the district courts to adjudicate claims brought by or on behalf of institutionalized persons themselves."). Instead, the Court balances the public interest with the understanding that the Federal Agreed Order is in place and provides a comprehensive regulatory scheme for Jail operations.

48

Plaintiffs contend that it is their desire to coordinate relief between the two cases, the fact is that any injunction here would change the role and duties of the monitors in that case. Plaintiffs presented no evidence or argument of how the two injunctions could be coordinated in such a way as not to impose a severe financial burden on the Jail or practical burden on the monitors under the Federal Agreed Order.

The strong policy against entering injunctions in the prison context represents he strong public and institutional interest in leaving the operation of jails to those who best know the field. *See Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (warning courts against becoming "enmeshed in the minutiae of prison operations"); *see also* 18 U.S.C. § 3626(a)(2) (limiting range of injunctions that can be issued in jail cases). Prison conditions are important matters of public policy that prison officials are peculiarly situated to address. Judicial oversight of jails in the form of injunctive relief is "limited by the nature of our mission: that mission is to ensure that those facilities meet the requirements of the Constitution. Beyond what is proper to that end, we lack authority to interfere with the lawful discretion of state officials to manage jail facilities as they see fit." *Inmates of Suffolk County Jail v. Kearney*, 928 F.2d 33, 36 (2nd Cir. 1991) (Campbell, J., concurring); *accord Williams v. Lane*, 851 F.2d 867, 871 (7th Cir. 1988). Courts, therefore, approach the issuance of injunctive orders in the prison setting with caution and Plaintiffs have provided no public policy reason for departing from this usual course of caution. *See Farmer*, 511 U.S. at 846 .

## **CONCLUSION**

Because Plaintiffs' have failed to demonstrate any likelihood of success on the merits that Defendants have been deliberately indifferent to the risk of harm at the jail and the evidence presented at hearing demonstrates that Defendants have worked diligently – and with marked

success in many areas – at combatting the danger that exists at the Jail, the motion for preliminary injunction (Dkt. No. 36) is denied. For the reasons stated herein, President Preckwinkle and Cook County's motion to dismiss (Dkt. No. 81) is denied. The Sheriff's Office Defendants' motion to dismiss (Dkt. No. 144) is granted in part and denied in part. The Amended Complaint is dismissed as to Lieutenant Lewis, but the remainder of the motion is denied. Defendants' motion to strike Plaintiffs' submission related to the preliminary injunction hearing (Dkt. No. 231) is denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 31, 2015